# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

XUN LI,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

No. 05-70053

Agency No.
A96-349-858

XIANGZHE CUI,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

No. 05-72298

Agency No.
A96-349-242

HE YUN FANG,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

No. 05-76786

Agency No.
A78-312-198

OPINION

On Petitions for Review of Orders of the
Board of Immigration Appeals

Argued and Submitted
March 6, 2008—Pasadena, California

Filed March 23, 2009

3649

Before: Mary M. Schroeder, Kim McLane Wardlaw, and Richard C. Tallman, Circuit Judges.

Opinion by Judge Wardlaw

## COUNSEL

### Li v. Holder, No. 05-70053

Joseph S. Porta, Law Offices of Cohen & Kim, Los Angeles, California, for petitioner Xun Li.

Robert C. Balfe, United States Attorney, Western District of Arkansas; Deborah J. Groom, Assistant United States Attorney, Fort Smith, Arkansas, for Attorney General Holder.

### Cui v. Holder, No. 05-72298

Miguel A. Olano, Santa Clarita, California; Patricia Vargas, Vargas & Associates, Alhambra, California, for petitioner Xiangzhe Cui.

Nairi M. Simonian, Department of Justice, Washington, D.C.; Peter D. Keisler, Assistant Attorney General; Norah Ascoli Schwarz, Office of Immigration Litigation; and Karen D. Utiger, Department of Justice, Washington, D.C., for Attorney General Holder.

### Fang v. Holder, No. 05-76786

Jarrett A. Green, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, for petitioner He Yun Fang.

Matthew C. Mulford, Deputy Attorney General, San Diego, California; Peter D. Keisler, Assistant Attorney General; and

Terri J. Scadron and Anthony W. Norwood, Office of Immigration Litigation, Washington, D.C., for Attorney General Holder.

---

**OPINION**

WARDLAW, Circuit Judge:

The consolidated petitions of Xun Li, Xiangzhe Cui, and He Yun Fang present the same question of law.[1] Police in the People's Republic of China are alleged to have arrested and tortured Chinese petitioners of North Korean descent for having provided humanitarian assistance to North Koreans seeking refuge in China. The Board of Immigration Appeals ("BIA") denied each of the three petitioners' asylum applications, characterizing the Chinese authorities' treatment of the petitioners as prosecution for a criminal act—that of harboring foreign citizens—rather than persecution on account of political opinion. The BIA, however, did not rely upon any Chinese law that actually criminalizes the provision of food and clothing to undocumented North Koreans or other foreigners so as to give rise to a "legitimate prosecutorial purpose." *See Ratnam v. INS*, 154 F.3d 990, 995-96 (9th Cir. 1998). Nor have we discovered a Chinese law that prohibits providing assistance to foreign refugees. Rather, the BIA seems to have imported into China what it perceived would be criminal activity in the United States. The policy of the United States, however, through the North Korean Human Rights Act of 2004, 22 U.S.C. §§ 7801-7845, has been to

---

[1]We hereby consolidate these petitions because they each involve a Chinese citizen of North Korean descent who was allegedly persecuted for giving aid, food, and shelter to North Korean refugees. We grant relief only to Xun Li, so we discuss Li's petition in detail and take those facts as true for purpose of our development of the law. In accompanying memorandum dispositions, the panel denies relief to He Yun Fang, and a two-judge majority denies relief to Xiangzhe Cui.

encourage the very type of humanitarian assistance provided here. We have jurisdiction pursuant to 8 U.S.C. § 1252, and we hold that when a petitioner violates no Chinese law, but instead comes to the aid of refugees in defiance of China's unofficial policy of discouraging such aid, a BIA finding that the petitioner is a mere criminal subject to legitimate prosecution is not supported by substantial evidence.

## I.  BACKGROUND

China's mountainous border provinces contain one of the world's most acute humanitarian crises.[2] Famine in North Korea, compounded by political repression, has propelled into China a stream of desperate North Korean refugees with few options for survival. According to the U.S. Department of State, as many as 50,000 North Koreans (75 percent of whom are female) have journeyed to China in search of sustenance. *See* Rhoda Margesson et al., Congressional Research Service Report for Congress, *North Korean Refugees in China and Human Rights Issues*, CRS-4 (Sept. 26, 2007), *available at* http://www.fas.org/sgp/crs/row/RL34189.pdf [hereinafter CRS Report]. The North Koreans fleeing their homeland do so at severe risk: Article 47 of the North Korean Penal Code designates "defection" as a capital crime. *Id.* at CRS-9. Life in China also entails significant peril, however, as China has developed an unofficial policy of discouraging aid to North Korean refugees. *Id.* at CRS-10 to -12, CRS-25. China similarly has refused to allow U.N. agencies, including the U.N. High Commissioner for Refugees, to provide assistance. *Id.* at CRS-10 to -12. Under a bilateral 1986 repatriation agreement with North Korea, China occasionally deports North Korean refugees to an uncertain fate, but most refugees appear to be

---

[2]Although the IJ concluded that Li was not credible, we find that this adverse credibility determination is not supported by substantial evidence. Our recitation of the background facts is taken from Li's testimony, which, given our rejection of the adverse credibility finding, we accept as true. *See Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004).

quietly ignored. *Id.* at CRS-11 to -12. Viewing the North Koreans as nothing more than economic migrants, China does not allow them to apply for asylum, *id*. at CRS-11, and it will not allow its own citizens to assist the refugees. Confronting this stalemate, individual Chinese citizens, such as the petitioners here, have defied China's policy and provided some relief in the form of food, clothing, and shelter to ameliorate the plight of these North Korean refugees.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

Xun Li ("Li") is a thirty-eight-year-old Chinese native and citizen of North Korean descent. Before he left China, Li lived in Yanji City, which is located in Jilin Province, a mountainous region in northeastern China that borders North Korea, and worked as a tour guide.[3] Around 2001, during a difficult time in Li's life, Li met Dong Hoa Cui ("Hoa"), a North Korean citizen and Christian pastor who preached to Li about Christianity. In time, Li decided to convert to Christianity. He began practicing in a nondenominational church. The church held services every Sunday at the home of one of the members. The services rotated to a different home each week, and there were usually at least ten members at each meeting. Yun Ho Jen ("Jen") led the meetings.

In October 2002, Hoa asked Li to provide shelter and assistance to Christian North Koreans who were fleeing persecution, and Li agreed. In late November, Li began providing shelter to two North Korean refugees by allowing them to stay in his home. On the evening of December 8, 2002, Li's church held a small service at his home with other members

---

[3]Li's work was seasonal. From April through September, he lived on Changbai Mountain, approximately six hours by car from Yanji City, and led tours. From October through March, he lived in Yanji City and prepared for the tour season by doing paperwork and taking classes to enrich his knowledge as a guide.

and the North Koreans in attendance. Around 9:00 p.m., the police came to the door, arrested and handcuffed Li and the others in attendance, including the North Koreans, and took them all to the police station. At the station, the police took the group to an interrogation room. It was approximately 11:00 p.m. when the interrogation began. The police asked, "Who is your leader?" When no one responded, the police began slapping each of them on their faces. Finally, Jen admitted he was the leader, at which point he was taken away from the group. Li later learned that Jen was sent to a labor camp.

Li was the second one to be separated from the group and interrogated individually. The police asked, "What was the reason to for you to join the cults? And why did you giving asylums to the North Korean?"[4] The police also asked, "You know that you [giving] asylum to those North Koreans would be a violation of the law?" Li responded:

---

[4]The hearing transcript is replete with both translation and transcription problems. We have held that an asylum applicant has a due process right to be given competent translation services if he does not speak English. *He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir. 2003); *see Perez-Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000) ("It is long-settled that a competent translation is fundamental to a full and fair hearing."). Yet, "[e]ven where there is no due process violation, faulty or unreliable translations can undermine the evidence on which an adverse credibility determination is based." *He*, 328 F.3d at 598; *see also Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) (finding that apparent inconsistencies were due to the petitioner's difficulties with English and thus could not support the IJ's negative credibility finding); *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 662 (9th Cir. 2003) ("[W]e have long recognized that difficulties in interpretation may result in seeming inconsistencies, especially in cases . . . where there is a language barrier."). Li does not speak English. Although a Mandarin interpreter was present at Li's hearing, numerous translation difficulties occurred. These difficulties were compounded by the IJ's and the government counsel's frequent interruptions. Thus, as we discuss further below, some of the perceived inconsistencies on which the IJ based his adverse credibility determination had more to do with translation and transcription problems than with the credibility of Li's claim.

> I believe in the religion. It's my personal to freedom.
> And then in regard to accommodating the North
> Koreans, they been sufferings and it was very brutal.
> And it's human to rights to give them the protection.
> And then would it be something in violation the law
> that to accommodate those suffered people?

Li said that he gave this statement to the police "[b]ecause
that's how [he] feel[s] to and without any guilt." Thus, Li
stated his belief that he should aid the North Koreans to pro-
tect their human rights, and that it was consistent with his reli-
gious beliefs to protect them.

The interrogation continued with the police telling Li that
they wanted a list of all the church members and how they
had helped the North Koreans. When Li refused to disclose
the names and to explain how the church members had
helped, one interrogating officer began to hit and punch the
handcuffed Li in the face "vigorously." The officer then
kicked Li backward to the floor and continued punching him
as blood began to flow from Li's nose and lips. Once Li hit
the floor, another officer joined in, and the officers then took
turns kicking Li in the head and stomach. Li, remaining con-
scious, tried to shield himself from the blows. When Li again
refused to disclose the names of the church members and to
explain their help to the North Koreans, the officers told him
that he was "going to suffer for the consequences." The offi-
cers then stripped him down to his underwear and tied him to
an electric pole. In the frigid December night, the officers left
Li, who was bleeding and still handcuffed, exposed to the
below-freezing temperature for nearly an hour. They eventu-
ally retrieved Li and resumed questioning. Li was paralyzed
and frozen, and was unable to respond. The officers then told
Li they had all the evidence they needed—"the Bible and also
the North Koreans"—to sentence him to a labor reform camp.
Li spent fifteen days at the labor camp, where the other
inmates continuously beat him up. Li's family finally secured

his release by furnishing a 5000 RMB[5] bribe to the police department. In exchange, Li was required to sign a letter of guarantee promising to give up his faith, report on other church members, and obey Chinese laws. The guarantee also stated that Li had to report to the local police station every week, which he did for a short time.[6] Fearing Chinese authorities, however, Li decided to seek asylum in the United States. He paid 120,000 RMB[7] to travel from China to South Korea to Vancouver to Seattle to Los Angeles, where he requested asylum in May 2003.

The Immigration Judge ("IJ") denied Li's petition for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") on the basis of an adverse credibility finding. The IJ alternatively found that, even if Li were credible, his testimony did not establish past persecution because the actions of the officers did not rise to the level of persecution. The IJ stated that the beatings Li suffered, "[a]lthough . . . certainly [not] pleasant," were not severe enough to constitute persecution. The IJ acknowledged that Li "continued to suffer some mistreatment at the labor camp," but found this treatment did not constitute persecution because "it was not at the hands of the police or any other officials of the government, but . . . rather at the hands of his fellow prisoners." The IJ then turned to "the question as to whether [Li] was really arrested and sentenced to the labor camp because of the harboring of illegal aliens." The IJ assumed that Li's detention and sentence to the labor camp were a "legitimate sanction for violation of the law by that country." The IJ reasoned: "[O]ne of the charges that [Li] clearly admits is that he was harboring a [sic] illegal aliens, *which is not only apparently a crime in China*, but would be

---

[5]RMB, the currency in China, stands for "Renminbi" (literally, "the people's currency").

[6]Li testified, however, that he tore up the letter of guarantee soon after he was released from the labor camp.

[7]At the time, 120,000 RMB was approximately $15,000.

a crime in the United States as well" (emphasis added). The IJ failed to cite to any Chinese law Li had violated. In addition to rejecting the possibility that Li was persecuted on account of his political opinion, the IJ also found Li had failed to demonstrate that he was persecuted on account of religion or any other protected ground. The IJ therefore exercised his "discretion to not grant asylum to [Li]." The IJ also rejected Li's application for withholding of removal and protection under CAT. The BIA affirmed without opinion. Li timely petitions for review.

## III.　STANDARD OF REVIEW

When the BIA adopts the reasoning of the IJ, we review the decision of the IJ. *See Kazlauskas v. INS*, 46 F.3d 902, 905 (9th Cir. 1995) ("Because the BIA did not independently review [the applicant's] case and instead adopted the IJ's opinion, we review the decision of the IJ."); 8 C.F.R. § 1003.1(e)(4). We review the IJ's determination that an applicant has not established asylum eligibility for substantial evidence, *see Tang v. Gonzales*, 489 F.3d 987, 989-90 (9th Cir. 2007), upholding a determination when it is " 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,' " *Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir. 2004) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). To reverse a finding "we must find that the evidence not only *supports* that conclusion, but *compels* it." *Elias-Zacarias*, 502 U.S. at 481 n.1.

## IV.　DISCUSSION

The Attorney General may, in his discretion, grant asylum to applicants determined to be refugees within the meaning of section 101(a)(42)(A) of the Immigration and Nationality Act. 8 U.S.C. § 1101(a)(42)(A); *see id.* § 1158(b)(1). An applicant qualifies as a refugee when the "applicant is unable or unwilling to return to his home country because of a well-founded fear of future persecution on account of race, religion, nation-

ality, membership in a particular social group, or political opinion." *Navas v. INS*, 217 F.3d 646, 654 (9th Cir. 2000). An applicant may establish a "well-founded fear of future persecution" in two ways: proof of past persecution or a demonstration that the applicant has a subjectively genuine and objectively reasonable fear of future persecution. *Fisher v. INS*, 79 F.3d 955, 960 (9th Cir. 1996) (en banc). To be eligible for asylum, an applicant must demonstrate a nexus between the alleged persecution and one of the five protected categories. *See Pedro-Mateo v. INS*, 224 F.3d 1147, 1150-51 (9th Cir. 2000). A showing of past persecution gives rise to a rebuttable presumption that the applicant has a well-founded fear of future persecution. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004).

## A.   Credibility Determination

[1] We review credibility findings under a substantial evidence standard.[8] *Rivera v. Mukasey*, 508 F.3d 1271, 1274 (9th Cir. 2007). An adverse credibility determination must be based on "specific, cogent reasons" found in the record. *Singh v. Gonzales*, 439 F.3d 1100, 1105 (9th Cir. 2006) (internal quotation marks omitted). One of these reasons must go to the heart of the asylum claim. *See Li v. Ashcroft*, 378 F.3d 959, 964 (9th Cir. 2004). "Minor inconsistencies in the record that do not relate to the basis of an applicant's alleged fear of persecution, go to the heart of the asylum claim, or reveal anything about an asylum applicant's fear for his safety are insufficient to support an adverse credibility finding." *Mendoza Manimbao*, 329 F.3d at 660. Further, the adverse credibility finding must be based on the record before the IJ. *See Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir. 2000) ("Speculation and conjecture cannot form the basis of an

---

[8]Because Li applied for asylum before May 11, 2005, we apply the pre-REAL ID Act standards to his adverse credibility determination. *See Singh*, 439 F.3d at 1105; *Li*, 378 F.3d at 964.

adverse credibility finding, which must instead be based on substantial evidence.").

The IJ found that Li's testimony lacked credibility based on "a number of events" that the IJ had difficulty reconciling. Although the IJ did not find that any one of these events actually supported an adverse credibility determination, he concluded that "considered cumulatively," they undermined Li's testimony.

**[2]** The IJ's scatter-shot justifications for his adverse credibility determination, however, are riddled with speculation, *see id.*, and are based on minor inconsistencies that do not go to the heart of the claim, *see Mendoza Manimbao*, 329 F.3d at 660.

**[3]** The IJ stated that "it's difficult to reconcile why the North Koreans would be fleeing to China where religion is also prohibited." The IJ engaged in impermissible speculation and conjecture in his assumption that the unidentified North Koreans aided by Li fled North Korea, a brutal dictatorship that "continues to commit numerous, serious human rights abuses," 22 U.S.C. § 7801(1), to escape religious persecution. While there may be many reasons that North Koreans seek refuge in China, "it is clear that two key elements driving North Koreans across the border into China include deteriorating humanitarian conditions—mainly due to food shortages —and human rights violations." CRS Report, at CRS-6. Thus, the IJ relied on impermissible speculation as to the North Korean refugees' motivation to create an inconsistency where none existed. *See Shah*, 220 F.3d at 1071.

**[4]** The IJ also found it "difficult to reconcile" that some of the fleeing North Korean refugees may have gone to South Korea as a safe haven, as Li testified, while Li himself chose the United States as a refuge. The IJ could not understand why Li did not also want to stay in South Korea, especially given that "he speaks Korean fluently and is of Korean

nationality." Once again, the IJ manufactured an inconsistency he thought required "reconciliation," this time by speculating as to the individual circumstances of the refugees Li aided and Li's own circumstances, which were quite different. While South Korea "remains the primary destination for North Korean refugees," CRS Report, at CRS-14, who transit through China because "it is impossible to cross the heavily mined demilitarized zone leading to South Korea,"[9] Li is not a North Korean refugee; he is a citizen of China and, thus, a Chinese refugee. Moreover, Li explained why he remained only temporarily in South Korea: fear of extradition back to China. The IJ inexplicably failed to credit—or even mention —Li's legitimate explanation as to the reason he, as opposed to the North Korean refugees, could stay only temporarily in South Korea. It goes without saying that China and South Korea have a different diplomatic relationship than that which exists between North Korea and South Korea. While the only record evidence as to South Korea's extradition policy is Li's testimony, there is nothing in the record to contradict his understanding that, as a Chinese citizen, he would be returned to China if found by the South Korean authorities.

The IJ next stated that it was "difficult to reconcile why exactly [Li] was arrested." Li testified that the Chinese authorities told him he was arrested for being part of a religious "cult" and for giving asylum to the North Korean refugees. The IJ did not find anything that contradicts the fact that

_____

[9]Barbara Demick, *China Feels Pressure over North Koreans*, L.A. Times, Feb. 22, 2008, at A-11. The 2.5-by-151-mile demilitarized zone, or DMZ, that spans the border between North and South Korea is known as "the world's most heavily fortified border" and "is dotted with landmines and bunkers and crisscrossed by barbed wire." Online NewsHour, PBS, *North Korea: Nuclear Standoff*, Oct. 19, 2006, http://www.pbs.org/newshour/indepth_coverage/asia/northkorea/dmz.html. When President Clinton visited the DMZ in 1993, he called it "the scariest place on Earth." Christoph Bluth, *Korea* 137 (2008). *See generally* Dick K. Nanto, Library of Congress, *North Korea: Chronology of Provocations, 1950-2003* (Mar. 18, 2003), *available at* http://www.fas.org/man/crs/RL30004.pdf.

Li was arrested because he was practicing his religion and sheltering North Koreans. Rather, the IJ credited the arrest, but yet again found an inconsistency based on his own speculation that the police should have ferreted out the purposefully secret religious meeting sooner. However, that the arrest occurred after a year of secret meetings, as opposed to after one week, does not suggest anything about the credibility of the claim. Moreover, the IJ fully credited Li's testimony that one of the two reasons for his arrest was giving humanitarian aid to the North Korean refugees.[10]

[5] The IJ also raised doubts about Li's testimony that he had held church services in his house about eight times. The IJ assumed that Li could not be telling the truth because "he admit[ted] that he only participated in the church from October to April when he was on the off-season for his work."[11] The IJ erred in reaching this conclusion. Li testified that he began attending the church services in October 2001. The IJ asked Li, "And so how [many] different members' houses did you meet at?" Li responded, "We have more than 10 of us, so we . . . take the rotations." The IJ then asked, "So would it be fair to say that you met at your house eight times before the December 8, 2002 [meeting]?" Li said yes. Although it is unclear whether the services rotated to a new house each Sunday or just once a month, it is clearly possible that Li hosted the services eight times between October 2001 and December 8, 2002.[12] Although Li admitted that, because of his job as a tour guide, he usually could not attend the services between April and September (though he did attend when he had the day off), there were still thirty-seven Sundays during the off-

---

[10]The IJ credited this testimony, but erred as a matter of law in concluding, without referencing a Chinese law, that Li's aid to the refugees was a criminal act. *See infra* IV.C.

[11]Li testified that he attended services between October and March, not, as the IJ stated, between October and April.

[12]Li stated that he remembered hosting the services in October 2001 and on December 8, 2002.

season on which Li could have hosted the services. Without knowing how the rotation system worked, the IJ improperly speculated that Li's statement that he held services about eight times was an inconsistency.[13] Even if this were an inconsistency, however, it still was not a proper basis for the IJ's adverse credibility finding because it does not go to "the heart of the asylum claim." *Mendoza Manimbao*, 329 F.3d at 660. Whether he hosted the services eight times, or six or four, does not impact the question of whether he was attacked by Chinese authorities on December 8, 2002, or whether he would fear returning to China. *See Singh v. Ashcroft*, 362 F.3d 1164, 1171 (9th Cir. 2004) ("[E]ven if we were to agree with the INS that this testimony was inconsistent, any discrepancy cannot be viewed as [an] attempt[ ] by the applicant to enhance his claims of persecution, [and thus has] no bearing on credibility." (alterations in original) (internal quotation marks omitted)).

The IJ also found it "difficult to reconcile why it's so important for [Li] to come to America so that he can practice his religion when he did not know what the teachings were of the registered Christian church of his home town." Li testified that he came to the United States to practice his Christian religion. The IJ did not find anything in the record to contradict Li's claim that he is a Christian; indeed, he credited Li's testimony that he is a practicing Christian, but nevertheless suggested that Li's failure to know "the difference between the teachings of the Presbyterian church [that he attends in Los Angeles] and the teachings of the church in his home town[ ]" undermines Li's basis for seeking to practice Christianity at his new Presbyterian church. Li was introduced to a particular branch of Christianity and decided to worship within that church, without pursuing other options. What a new Christian convert in China would know (or even could know) about the

---

[13]In fact, it is the IJ—rather than Li—who seems inconsistent here, given that the IJ himself calculated that Li had met at his house eight times, which he then asked Li to confirm by asking a leading question.

theological positions of various denominations is pure conjecture.

What we do know from the 2002 U.S. Department of State Country Report in the record is that the Chinese government "continued to enforce regulations requiring all places of religious activity to register with the Government or to come under the supervision of official, 'patriotic' religious organizations," and that "some religious groups, including unregistered Protestant and Catholic congregations and members of nontraditional religious groups, continued to experience varying degrees of official interference, harassment, and repression." Bureau of Democracy, Human Rights, & Labor, U.S. Dep't of State, Country Reports on Human Rights Practices: China (Includes Tibet, Hong Kong, and Macau) (Mar. 31, 2003), *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/~18239.htm. It is only logical that Li would choose the United States, where his freedom to practice religion is constitutionally guaranteed, as his final destination.

Next, the IJ stated that Li admitted one of the reasons he wanted to come to the United States was for better economic opportunities. A review of the hearing transcript and Li's asylum application makes clear, however, that Li seeks asylum on the grounds of religious and political persecution, and that economic benefits are—at most—a secondary motivation. During the hearing, the government counsel asked Li, "[D]id you come to the United States for better job opportunities?" Li said yes. Neither the counsel nor the IJ asked any follow-up questions about this alleged motivation. Even if economic opportunities were a secondary motivation, it is not a basis for undermining Li's wholly consistent testimony that he was persecuted on account of religion and political opinion. Li repeatedly stated that he came to the United States to escape religious and political persecution in China. Similarly, his asylum application states that he is seeking asylum on the basis of religion, political opinion, and membership in a particular social group, as well as relief under CAT.

The IJ also illogically discredited Li's testimony because Li paid 120,000 RMB ($15,000) to escape China, even though he initially thought he might leave China for only a few years. The IJ assumed that no one would pay such a large amount of money if he had plans to remain in the United States for only a few years. First, the IJ had no basis for concluding that $15,000 was a large sum of money to secure a refugee's safe transit with the necessary documentation from China to the United States. Second, if in fact the sum was either relatively or absolutely substantial, it would seem to make Li's story more, rather than less, credible—expenditure of a large sum of money for transit to a destination for only a few years suggests the degree to which Li feared for his life. The IJ merely speculated that no one would spend $15,000 to flee persecution by the Chinese government. There is no inconsistency in Li's payment of $15,000 to travel to the United States to escape persecution, and his hope that one day he could be reunited with his family.

The IJ also found a discrepancy where none existed in Li's testimony about his medical treatment. Li testified that he went to Yanji Hospital after he was released from the labor camp. He stated, "I had examination over there, and then they gave me the prescription, the medicine. . . . [I]t was a supplement, vitamins. And then also my stomach was bad and then there's some medication for my stomach." Li provided a form corroborating his treatment at the hospital. However, Li had told the asylum officer that his sister, who is a doctor at a firm, provided his medical treatment. The government counsel asked, "So why is it that you submitted to Court a document indicating that you went [to] the Yanji city hospital if, in fact, it was your sister who treated you and she works for a big firm?" Li explained, "Because my sister, even though she works for a large firm, she specialize in looking after the welfare of the employees of the firm. So she's not a specialist in that field and that's why I needed to go to a specialized hospital." The counsel then asked, "[Y]ou're saying that your sister treated you and you went to a hospital?" Li responded,

"It just a examination that I went." The counsel continued to press Li: "[Y]ou only told the asylum officer that your sister was the only one who treated you." Li again explained, "No, officer I believes that she took care of me at home giving me the injections and also giving me the pills." That Li was treated both by his sister and at the hospital does not render his testimony inconsistent. Although the record is rendered vague by either translation problems or Li's failure to understand the question, it does appear that Li initially sought his sister's help and, then, because his injuries were outside of her speciality, went to the local hospital for examination. Regardless, whether Li's injuries were treated by his sister or at a hospital, or both, does not go to the heart of his claim and has little bearing on the veracity of the persecution he describes. *See Li*, 378 F.3d at 964.

The IJ also found that Li was not credible because "he could not explain why he presented the [train] ticket as evidence to this Court that he now claims was erroneous." Li testified that he departed Yanji City by train on February 20, 2003, but the ticket stub was dated February 10, 2003. Li explained that the conductor made a mistake in writing the date on the ticket, and that he only "show[ed] it to [the IJ] verifying to the fact that I actually depart." In any event, such confusion around dates cannot support an adverse credibility determination. *See Bandari v. INS*, 227 F.3d 1160, 1166 (9th Cir. 2000) ("Any alleged inconsistencies in dates that reveal nothing about a petitioner's credibility cannot form the basis of an adverse credibility finding.").

Finally, the IJ took issue with Li's testimony about conversations he had with his family after arriving in the United States; in particular, the IJ questioned Li's testimony that "his mother had been threatened because the police wanted to know his whereabouts." The following exchange took place during the hearing:

> IJ: Okay. Why do you fear, sir, going back to China?

Li:   If I ever return then, I will be sentenced.

IJ:   And how do you know that?

Li:   Because my family, when I talk to them through the phone, they said you're not to return. If you ever return, then you will be arrested. And then to put in jail. So for sure that I do not come back.

. . . .

IJ:   Okay. And why would you — Were you thinking that you could return to China in a few years?

Li:   Right now my family told me that in China you are not possibly to able to return.

IJ:   I understand that. But when you departed, you didn't know that. So what were you thinking that a few years would do for you?

Li:   I just wanted to get away to from the Chinese authority. . . . .

. . . .

IJ:   Have your parents been harassed by the police?

Li:   They came to my home and threatening to my mother saying that you better urge your son to return.

IJ:   Did they do anything more than just threaten her? What did they threaten her with?

Li:   Whether to persuade me to return as soon as possible. And too because your son has violated the law and it could be serious.

IJ:   So did they threaten her with putting her in jail?

Li:   No.

We are perplexed as to why the IJ even mentioned these statements; they only seem to support—rather than undercut—Li's asylum claim.

**[6]** The IJ's adverse credibility determination thus rests upon an illusory foundation of speculation, uninformed conjecture and assumptions, fabricated inconsistencies, and discrepancies having nothing to do with Li's claim for asylum. On the other hand, the IJ credited each aspect of Li's testimony that actually did support his claim for asylum. For example, the IJ fully credited Li's claim that he had been arrested, detained, and "slapped," and sentenced to a labor camp for giving humanitarian aid to North Koreans. Because we find no "specific, cogent reasons" in the record supporting the IJ's adverse credibility determination, *Singh*, 439 F.3d at 1105 (internal quotation marks omitted), we conclude that the adverse credibility finding is not supported by substantial evidence. Absent an adverse credibility determination, we must accept Li's testimony as true. *See Kalubi*, 364 F.3d at 1137.

## B.   Persecution

**[7]** Persecution is "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Gormley*, 364 F.3d at 1176 (internal quotation marks omitted). It is well established that physical violence is persecution under 8 U.S.C. § 1101(a)(42)(A). *See, e.g.*, *Guo v. Ashcroft*, 361 F.3d 1194, 1197-98, 1202-03 (9th Cir. 2004) (finding beatings of a Chinese detainee to rise to the level of persecution); *Chand v. INS*, 222 F.3d 1066,

1073 (9th Cir. 2000) ("Physical harm has consistently been treated as persecution.").

Because the IJ found that, even if Li had testified credibly, he did not suffer any past persecution on account of a protected ground, we need not remand Li's asylum application for a determination on this issue. *See Guo*, 361 F.3d at 1204. We first address whether the Chinese authorities' brutal attacks on Li rise to the level of persecution, and then turn to the question of whether the persecution was on account of political opinion.

**[8]** We hold that the IJ erred in finding that the actions of the police did not rise to the level of persecution. *See Gormley*, 364 F.3d at 1176-77. Accepting Li's testimony as true, the record compels the conclusion that Li was persecuted. *See Elias-Zacarias*, 502 U.S. at 481 n.1; *Silaya v. Mukasey*, 524 F.3d 1066, 1068 (9th Cir. 2008). As we already described, the officers repeatedly hit Li in the face in an effort to extract a confession and to punish him for aiding the North Koreans. Next, the officers took turns kicking him in the head and stomach as he lay on the floor. They then left the bloodied and still handcuffed Li exposed to the freezing December night for nearly an hour. Finally, Li endured further police-sanctioned beatings during the fifteen days of his confinement at the labor camp. The police were either unwilling or unable to control the beatings of Li by his fellow inmates. *See Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000) ("[A]ffirmative state action is not necessary to establish a well-founded fear of persecution if the government is unwilling or unable to control those elements of its society responsible for targeting a particular . . . individual[ ]." (internal quotation marks omitted)); *cf. Kalubi*, 364 F.3d at 1136 (finding that harsh conditions in an overcrowded prison cell, even absent physical beatings, established past persecution). Li required medical attention at a hospital upon his release. The totality of the circumstances demonstrate that Li was persecuted. *See Chand*, 222 F.3d at 1073; *Guo*, 361 F.3d at 1203

("We look at the totality of the circumstances in deciding whether a finding of persecution is compelled."); *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998) ("The key question is whether, looking at the cumulative effect of all the incidents a petitioner has suffered, the treatment she received rises to the level of persecution."). The IJ therefore erred in finding that the beating Li suffered did not rise to the level of persecution required by law.

The IJ's reliance on *Prasad v. INS*, 47 F.3d 336 (9th Cir. 1995), is misplaced. Prasad had been arrested, taken to a police station, and "hit on his stomach and kicked from behind." *Id.* at 339. His captors "did not threaten him explicitly," and he was released after four to six hours. *Id.* Although we condemned the attack on Prasad, we found that it was not "so overwhelming so as to necessarily constitute persecution." *Id.* This is clearly far less severe than what the Chinese police did to Li. Further, unlike Prasad, who was released after a few hours, Li continued to suffer for fifteen days at the labor camp. Lastly, the police did explicitly threaten Li. Thus, the comparison to *Prasad* does not support the IJ's conclusion.

## C.	*Pretextual Prosecution*

**[9]** We have long distinguished persecution from *prosecution*. An applicant very well may fear accountability for a criminal act in his native country; however, such fear does not necessarily entitle him to the protection of the United States. *See Chanco v. INS*, 82 F.3d 298, 301 (9th Cir. 1996) ("Persons avoiding lawful prosecution for common crimes are not ordinarily deemed refugees."). For example, an applicant avoiding prosecution for misappropriating funds may have a well-founded fear of returning home, but such fear does not bring him within the protected classes of our asylum law. *See Mabugat v. INS*, 937 F.2d 426, 429 (9th Cir. 1991).

**[10]** Nevertheless, we also have recognized that persecution and prosecution are not mutually exclusive. Indeed, prosecu-

tion may serve as the avenue by which agents of the state persecute a disfavored group. Violators of the Nazi-era Nuremberg Laws, for instance, may have been "prosecuted" under those virulently anti-Semitic laws; however, one would be hard-pressed to categorize the prosecution as anything other than persecution on account of religion. *See Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1574 (9th Cir. 1986) ("Few could doubt, for example, that any Jew fleeing Nazi Germany in the 1930's or 40's would by virtue of his or her religious status alone have established a clear probability of persecution." (internal quotation marks omitted)).

Understanding that persecution may appear in the guise of prosecution, we have carved out exceptions to the general rule that applicants avoiding prosecution for violations of criminal law are ineligible for asylum. Chief among these exceptions to the general rule are "disproportionately severe punishment and pretextual prosecution." *Fisher*, 79 F.3d at 962; *see Chanco*, 82 F.3d at 302 ("Although prosecution for a common law crime will not ordinarily constitute persecution, a showing of disproportionate punishment may support a claim that the prosecution is a pretext for persecution on account of political opinion.").

We explored the interplay between persecution and prosecution in *Bandari*, 227 F.3d 1160. There, a Christian Iranian citizen sought asylum in the United States following a "prosecution" for interfaith dating. *Id.* at 1163. While in high school, Bandari began dating a Muslim neighbor, a crime in theocratic Iran. *Id.* When police officers caught the two embracing in the street, they summarily arrested Bandari, took him to the police station, and began whipping him with a rubber hose until he lost consciousness. He was later sentenced to seventy-five lashes and a year in a prison. *Id.* at 1163-64. Bandari fled Iran to seek asylum in the United States. *Id.* at 1164. We declined to characterize the treatment of Bandari as a "legitimate criminal prosecution." *Id.* at 1168. While the initial stop of Bandari may have been "mere law enforcement," the ensu-

ing physical attacks "were clearly based on Bandari's religion." *Id*. We recognized that Bandari's claim may fall under a mixed-motive analysis, when police motivation sprung from both prosecutorial aims and religious hatred. *Id.* Yet, because an asylum applicant need only present " 'evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or implied protected ground,' " *id.* at 1168-69 (quoting *Borja v. INS*, 175 F.3d 732, 736 (9th Cir. 1999) (en banc), *superseded by statute*, REAL ID Act, Pub. L. No. 109-13, Div. B, Title I, § 101(a)(3)(B)(i), 119 Stat. 231, 303 (2005), *as recognized in Parussimova v. Mukasey*, 555 F.3d 734, 740 (9th Cir. 2009)), Bandari met his burden and we granted his petition.

We also have determined that the distinction between persecution and prosecution is less than clear cut when the "prosecution" lacks legitimacy or proceeds without the process normally due. In *Blanco-Lopez v. INS*, we declined to find an "actual, legitimate, criminal prosecution" when the El Salvadorian military accused Blanco-Lopez of being a guerilla who illegally smuggled arms from Nicaragua. 858 F.2d 531, 534 (9th Cir. 1988), *superseded by statute on other grounds*, REAL ID Act § 101(a)(3)(B)(i), *as recognized in Parussimova*, 555 F.3d at 740. The Attorney General argued that "El Salvador has the right to prosecute individuals accused of criminal activity and that such prosecution is readily distinguishable from persecution based on political beliefs." *Id*. We disagreed, finding

> no evidence in the record . . . that an actual, legitimate, criminal prosecution was initiated against Blanco-Lopez . . . . Indeed, Blanco-Lopez testified that, while a captive of the security forces, he was threatened with death unless he admitted to being a guerilla. We can hardly characterize this as an example of legitimate criminal prosecution.

*Id*. Further, we noted that Blanco-Lopez testified that if the security forces found him again, they would kill him without

instituting any formal prosecutorial measures. *Id.* We therefore concluded that the government's conduct was "not in furtherance of a criminal prosecution, but rather was [an incident] of governmental *persecution* based on Blanco-Lopez's perceived political beliefs." *Id.*; *see also Chand*, 222 F.3d at 1077 ("[R]esistance to discriminatory government action that results in persecution is persecution on account of a protected ground.").

[11] When the government lacks a legitimate prosecutorial motive or any "other logical reason for the persecution at issue," *Navas*, 217 F.3d at 657, we presume, as a matter of law, that "the motive for harassment is political," *id*. at 660 (internal quotation marks omitted); *see also Ahmed v. Keisler*, 504 F.3d 1183, 1196 (9th Cir. 2007) ("That Ahmed was beaten absent any due process also supports his claim of persecution on account of a political opinion."); *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir. 1985) ("When a government exerts its military strength against an individual or a group within its population and there is no reason to believe that the individual or group has engaged in any criminal activity or other conduct that would provide a legitimate basis for governmental action, the most reasonable presumption is that the government's actions are politically motivated."), *superseded by statute on other grounds*, REAL ID Act § 101(a)(3)(B)(i), *as recognized in Parussimova*, 555 F.3d at 740; *Ratnam*, 154 F.3d at 996 ("Torture in the absence of any legitimate criminal prosecution, conducted at least in part on account of political opinion, provides a proper basis for asylum and withholding of deportation even if the torture served intelligence gathering purposes.").

[12] The IJ erred in assuming that Li's detention and sentence to the labor camp were a "legitimate sanction for violation of [Chinese] law." Li cannot possibly have been legitimately prosecuted. Neither the IJ nor the Attorney General was able to cite to any Chinese statute or regulation that criminalizes Li's conduct, and the record demonstrates that no

such law exists. In a sworn affidavit, UC Berkeley School of Law Professor Robert C. Berring, who specializes in Chinese law and the Chinese legal system, attested that, to his knowledge, "there is no published law forbidding Chinese citizens from providing food and comfort to illegal aliens." Similarly, Professor Cheng Gan-Yuan, a specialist in Chinese criminal law who lived most of his life in China and formerly taught at the Nanjing Normal University School of Law, swears unequivocally that there "is no criminal law of any kind (written or verbal, formal or informal) in China prohibiting citizens from providing food, water, shelter, social assistance or other assistance to individuals who entered China illegally from another country."

International treaties further buttress our conclusion that Li's conduct was not criminal. China itself has treaty obligations to protect the North Korean refugees. China has acceded to the 1951 U.N. Convention Relating to the Status of Refugees,[14] and the 1967 Protocol to that Convention. *See Convention Relating to the Status of Refugees*, 189 U.N.T.S. 137 (2002), *available at* http://www.unhchr.ch/html/menu3/b/treaty2ref.htm; Congressional-Executive Commission on China, *2005 Annual Report* 113 (2005), *available at* http://www.cecc.gov/pages/annualRpt/annualRpt05/CECCannRpt2005.pdf.

---

[14]The Office of the U.N. High Commissioner for Refugees recently wrote:

> Certain provisions of the Convention are considered so fundamental that no reservations may be made to them. These include the definition of the term "refugee," and the so-called principle of *non-refoulement*, i.e. [sic] that no Contracting State shall expel or return ("*refouler*") a refugee, against his or her will, in any manner whatsoever, to a territory where he or she fears persecution.

Office of the U.N. High Commissioner for Refugees, *Introductory Note* to *Convention and Protocol Relating to the Status of Refugees* 5 (UNHCR 2007), *available at* http://www.unhcr.org/protect/PROTECTION/3b66c2aa10.pdf.

**[13]** Because no law prohibits Li's conduct, when the Chinese officials abruptly arrested Li in his home and took him to a police station where he endured physical abuse as part of a coercive interrogation aimed at locating North Korean refugees and discouraging the provision of humanitarian aid to them, the record *compels* the conclusion that the officials were not engaged in legitimate criminal prosecution. *Cf. Blanco-Lopez*, 858 F.2d at 534 (finding governmentally inflicted harm without formal prosecutorial measures to be persecution). The only crime Li might have committed was failure to cooperate with a police investigation;[15] however, he was not accused of this crime by the Chinese police. Moreover, as we discuss below, the record demonstrates that the police were not motivated by Li's failure to cooperate. Rather, they were motivated by a desire to punish Li for defying the unwritten Chinese policy of discouraging humanitarian aid to North Koreans.[16]

---

[15]China does have a law prohibiting the smuggling of aliens into its country; however, the conduct criminalized by the statute does not remotely resemble that undertaken by Li. Article 318 of the Criminal Law of the People's Republic of China reads in part: "Whoever makes arrangements for another person to illegally cross the national border (frontier) shall be sentenced to fixed-term imprisonment of not less than two years but not more than seven years and shall also be fined . . . ." Criminal Law of the People's Republic of China, pt. 2, Ch. 6, § 3, Art. 318 (1997), *available at* http://www.cecc.gov/pages/newLaws/criminalLawENG.php. There is no evidence in the record that Li had any role in assisting North Koreans to cross the Chinese border—certainly the Chinese police did not arrest or prosecute him for smuggling; rather, he was arrested for giving the refugees food, shelter, and other necessities.

[16]Additionally, the extreme physical violence inflicted upon Li was "disproportionately severe punishment" such that it may be independently considered persecution on this ground. *Fisher*, 79 F.3d at 962; *see Bandari*, 227 F.3d at 1168. As we already described, Li suffered grievously at the hands of the Chinese police, and the inmates at the labor camp. A reasonable factfinder would be compelled to find that Li's circumstances meet the persecution threshold.

### D.  Persecution on Account of Political Opinion

**[14]** Criticism of government actions or policies generally may be considered the expression of political opinion. *See Ahmed*, 504 F.3d at 1192 ("A political opinion encompasses more than electoral politics or formal political ideology or action."); *Njuguna v. Ashcroft*, 374 F.3d 765, 768-70 (9th Cir. 2004) (stating that acting "against government corruption" may express a political opinion, even when the action in question is "assisting two Kenyan women [to] escape from the Saudi royal family's employ"); *Al-Saher*, 268 F.3d at 1146 ("It is clear that Al-Saher's statements regarding the unfair distribution of food in Iraq resulted in Iraqi officials imputing an anti-government political opinion to Al-Saher."); *Borja*, 175 F.3d at 736 (holding that when Borja "articulated her political opposition" and thereby provoked an "immediate reaction" from her persecutors, it was clear that "no reasonable factfinder could fail to see the role her outspoken political opinion played both then and thereafter in what happened to her").

**[15]** The IJ erred in finding that Li was not persecuted on account of his political opinion. The police—who were implementing the unofficial Chinese policy of discouraging humanitarian aid to North Korean refugees—were motivated by a desire to brutalize Li for defying the policy by providing aid to the North Koreans and for expressing opinions contrary to this policy in his words and deeds. Persecutors' motivation should not be questioned when the persecutors specifically articulate their reason for attacking a victim. *See Elias-Zacarias*, 502 U.S. at 483-84; *see, e.g.*, *Kebede*, 366 F.3d at 811-12 (reversing the IJ's holding that the petitioner failed to establish that she suffered past persecution on account of political opinion when the petitioner testified that the soldiers who raped her stated during the rape that they were raping her because of her family's position in the prior Ethiopian regime).

There is direct evidence of the officers' motivation in the record—the officers specifically interrogated Li about why and how he had helped the North Koreans while they were brutalizing him. When Li would not disclose the names of the other church members who had provided aid, the officers threatened that Li was "going to suffer for the consequences." We already have recounted the various ways in which Li did in fact suffer at the hands of his persecutors. Moreover, before sending Li to the labor camp, where he continued to "suffer for the consequences," the police told him that they had all the evidence they needed—"the Bible and also the North Koreans." The evidence clearly demonstrates that the authorities persecuted Li to force him to conform to the government's unofficial policy, and that this policy was enforced coercively and without regard to China's criminal law.

[16] Li refused to obey the nebulous, unwritten policy that undocumented North Korean refugees should receive no aid from Chinese citizens, rather than leaving the refugees to starve, abject and unsheltered, or reporting them to the government to face repatriation and possible execution. Li was motivated by a moral obligation to protect and ease the suffering of the refugees—his deeds matching the words of the President of the United States and various members of Congress who likewise have protested the Chinese treatment of North Korean refugees. *See* CRS Report, at CRS-25. Though Li did not explicitly state his political disagreement with the policy until he was detained and interrogated, his actions clearly indicated his opposition before that point. One who is persecuted for protesting with lawful deeds is just as worthy of asylum under our laws as one who protested with words. *Cf. Mamouzian v. Ashcroft*, 390 F.3d 1129, 1134 (9th Cir. 2004) (holding that beatings resulting from protests against government practices constitute persecution on the basis of political opinion). Thus, Li's defiance of his government's unofficial policy gives rise to an inference that the ensuing attacks and beatings were on account of his political opinion, particularly when no other logical explanation for the attacks

exists, *see Navas*, 217 F.3d at 660, and the beatings intensified when Li refused to provide the names of the others who were assisting the refugees. We therefore hold that Li was persecuted by the Chinese authorities on account of his political opinion.

Holding otherwise would implicate serious policy concerns. Although the IJ purportedly looked to our nation's criminal laws to support his view that Li suffered legitimate prosecution for violating China's law, he neglected to consider our nation's law regarding the treatment of North Korean refugees, which completely undermines the IJ's legal extrapolation. The 108th Congress, with the assistance of President George W. Bush, acted to lend American support to the North Korean refugees by passing the North Korean Human Rights Act of 2004, 22 U.S.C. §§ 7801-7845. In this legislation, the United States decried the treatment of foreign aid workers attempting to assist North Korean refugees struggling in China, § 7801(21); sought to "promote a more durable humanitarian solution to the plight of North Korean refugees," § 7802(2); *encouraged* foreign nations to support the refugees, § 7832(a)(3); appropriated twenty million dollars a year to aid the refugees, § 7833(c)(1); urged China to handle the refugees in a manner consistent with its international obligations, § 7844(a); and directed the U.S. Secretary of State to help facilitate applications of these refugees to seek asylum in the United States, § 7843. The unfortunate irony presented by these petitions is that Li took actions consistent with U.S. law and policy facilitating foreign aid for North Korean refugees, and yet, when persecuted on that basis, was declared unfit to seek asylum here in the United States. It would be an odd form of justice, and one to which we do not subscribe, that would beseech people of good conscience to provide aid, officially designate recipients of the aid as refugees, and then determine that those who provided that aid are

categorically ineligible to enter the United States when other governments persecute them for providing the aid.[17]

## V.   CONCLUSION

Because on the record before us there exists no discernible legitimate prosecutorial purpose behind the Chinese officials' detention and beatings of Li, the record compels the conclusion that Li was persecuted on account of his political opinion, a protected category within our asylum law.[18]

[17] A finding of past persecution gives rise to a presumption that Li has a well-founded fear of future persecution were he to return to China. *See Tawadrus*, 364 F.3d at 1103. However, this presumption can be rebutted if the government can "demonstrate that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear." *Id.* (internal quotation marks omitted). Because this issue was not previously addressed, we remand Li's petition on the question of whether changed country conditions rebut the presumption of a well-founded fear of persecution. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam).

**PETITION GRANTED; REMANDED for further proceedings.**

---

[17]In light of our holding with respect to Li's claim of persecution on account of political opinion, we need not reach his claim of persecution on account of religion.

[18]Because we hold that Li has established his eligibility for asylum, we need not reach his withholding of removal and CAT claims.