**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| XINBING SONG, *Petitioner*, v. JEFFERSON B. SESSIONS III, Attorney General, *Respondent.* | No. 14-71113 Agency No. A087-885-446 AMENDED OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 9, 2017
Pasadena, California

Filed December 18, 2017
Amended February 15, 2018

Before: Sidney R. Thomas and Jacqueline H. Nguyen,
Circuit Judges, and Carol Bagley Amon,* District Judge.

Opinion by Judge Nguyen

---

* The Honorable Carol Bagley Amon, United States District Judge
for the Eastern District of New York, sitting by designation.

**SUMMARY**[**]

**Immigration**

The panel amended an opinion granting a petition for review of the Board of Immigration Appeals' denial of asylum and withholding of removal to a citizen of China who sought relief based on his political opinion.

The panel noted that there was no dispute that petitioner had experienced past persecution at the hands of local government, and that the petition turned on whether or not the persecution was on account of petitioner's actual or imputed political opinion. The panel held that the evidence compelled the conclusion that the Chinese government imputed an anti-government and anti-eminent domain opinion to petitioner, and persecuted him on that basis.

The panel vacated the denial of asylum relief, and remanded for consideration of whether petitioner met the other elements for asylum and withholding relief before exercising discretion whether to grant asylum.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Thomas Ogden (argued), Alhambra, California, for Petitioner.

Lisa Damiano (argued), Trial Attorney; Katharine Clark and Alison R. Drucker, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Chad A. Readler, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

NGUYEN, Circuit Judge:

Xinbing Song, a Chinese citizen, petitions for review of the Immigration Judge's ("IJ") and Board of Immigration Appeals's ("BIA") denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Because the evidence compels a finding that Song was persecuted by Chinese authorities on account of an imputed or actual political opinion, we grant the petition for review.

**I.**

Before arriving to the United States, Song lived in China's Hunan province.[1] In June 2009, Song's local

---

[1] This statement of facts is derived from the Administrative Record that was before the IJ and BIA, including Song's testimony, excerpts of a 2010 Human Rights Report from the U.S. Department of State, Bureau

government notified him that it planned to demolish and rebuild a building in which Song had owned a commercial unit since 1997. Such local demolition projects, designed to increase infrastructure and commercial development, have resulted in the forced relocation of millions of Chinese citizens.[2]

Forced demolition was the leading cause of social unrest and public discontent in China in 2010.[3] Affected residents often were not paid market value for their property, and sometimes received even less compensation than the government initially promised. Nearly 70% of respondents in one study reported that they had encountered problems with demolition and relocation, either relating to compensation or forced eviction. Government officials frequently colluded with property developers to pay those subjected to forced eviction as little as possible. Yet few legal remedies were available to displaced residents, and

---

of Democracy, *see* Human Rights, & Labor, Country Report on Human Rights Practices: China 22 (2010), https://www.state.gov/documents/organization/160451.pdf, and Chinese newspaper articles, *see* Yan Jie, Demolitions Cause Most Social Unrest, China Daily (June 6, 2011), http://www.chinadaily.com.cn/china/2011-06/27/content_12780316.htm; Qiao Long & Wen Yuqing, Eviction Death Sparks Clashes, Radio Free Asia (Luisetta Mudie trans., May 13, 2011), http://www.rfa.org/english/news/china/eviction-05132011135702.html.

[2] "[A]ccording to the Centre on Housing Rights and Evictions, 'at least 1,25 million households were demolished and nearly 3,7 million people were evicted' in the period from 1997 to 2007." Cong.-Exec. Comm'n on China, 111th Cong., Ann. Rep. 187 (2010), https://www.cecc.gov/sites/chinacommission.house.gov/files/2010%20 CECC%20Annual%20Report.PDF.

[3] *See also id.*

local officials sometimes retaliated against those who tried to protest.

Song's local government offered him 6,500 Yuan per square foot in compensation for his property. Song believed the offer violated a local regulation that provided for compensation of at least 10,000 Yuan per square foot.[4] Song attempted to negotiate with government officials, but he was told that he would not receive more than 6,500 Yuan per square foot.[5]

Song's neighbors in the building also disagreed with the offered compensation. Song went door to door in his neighborhood and organized a protest. On July 29, 2009, Song and over one hundred of his neighbors blocked the entrance to a local government building. The protestors held a banner that said "opposed to forced demolition" and chanted slogans like "give me my fair compensation," "please do what is just," and "return to me what is mine."[6]

---

[4] The regulation stated, "Pursuant to the Official Document No. SZ(2003)58 of Shangqiu City People's Government, the compensation of the store front properties shall be set as RMB11,000 - 13,000 Yuan per square meter, and residential properties shall be set as RMB3,000 - 4,000 Yuan per square meter." The first floor of Song's building was commercial, and the upper floors were residential.

[5] Given the text of the regulation, *supra*, n.4, it appears Song may have confused whether the compensation was per square foot or square meter in his testimony. The distinction is not relevant to the outcome here.

[6] Protests over forced demolition and relocation were common and often turned violent. As the 2010 Human Rights Report noted, "the vast majority of demonstrations concerned land disputes; housing issues; industrial, environmental, and labor matters; government corruption;

A few minutes into Song's protest, security guards and an unidentified, non-uniformed employee came out of the government building and asked for the leader of the protest. Song told the employee the protestors were people "subject to the [government's] eminent domain measure." One of the security guards went back inside and, a few minutes later, a government official came out of the building. The official asked who was in charge and why the protestors were there "to cause trouble and make problems." Song told the official he and two other neighbors were in charge and that the group was "just [t]here to obtain justice and fairness." When Song declined to disperse the protestors unless they were given "a fair remedy and justice," the official responded, "Do you realize the consequences of your actions?"

Song and the other leaders followed the government official into the building. Once inside, the government official recorded the leaders' names and other identifying information. The official said the protest could not continue because it was "anti-government" and "not right." The official said the government would issue a written decision on the city's demolition plans in the next week. Song informed the official that if he and his neighbors did not receive an adequate answer, the protestors would return.

---

taxation; and other economic and social concerns." Protestors, and in particular their leaders, were often targeted for prosecution. *See also* Cong.-Exec. Comm'n on China Ann. Rep., *supra*, at 5 ("Petitioners in many areas of China were mistreated, harassed, and detained for their involvement in advocating for housing rights and for organizing to protest forced evictions and relocations in which the government failed to meet its obligations to compensate residents fairly and in accordance with the law.").

Song received a letter from the local government on August 5, 2009, that the demolition would proceed. Song continued his protest of the forced demolition by hanging a banner from his unit expressing his opposition. The banner stated that Song would rather die than give up his property.[7] Song also moved his belongings into and began sleeping in one of the upstairs residential apartments, then vacated by its tenants because of the demolition notice.

Twelve days later, Song was arrested. Two police officers entered the apartment, overpowered his efforts to resist, and took Song to a detention center. He was charged with interfering with official duties. During the three days Song was jailed, police tortured and beat him, and encouraged his cell mates to do the same. Song was forced to spend an entire night in a squatting position. The police also interrogated him about his alleged crime. When asked why he had gathered the crowd of protestors, Song maintained that the compensation the government had offered was not fair and was inconsistent with government regulation.

Prison officials accused Song of being "anti-government," "subvert[ing] the government," and "preventing the [government] official from doing official duties." They tried to get Song to confess to the same. When Song refused, police beat him with a baton and electric baton until he passed out. Song suffered multiple injuries from the beatings, to the point that he was unable to walk.

---

[7] Such "sit-in" demonstrations, also common in China at the time, often turned violent and sometimes resulted in the resident's suicide or death.

Song's family managed to pay 10,000 Yuan to secure his release for medical treatment. After his release, Song was required to continue reporting to the police every week. Fearing that he would be arrested and tortured again, Song fled China and entered the United States on a visitor visa in January 2010. The police continued to look for Song for months after he fled.

## II.

Despite crediting Song's unrefuted testimony and admitting a 2010 Human Rights Report from the U.S. Department of State that documented the unrest caused by eminent domain disputes, the IJ denied Song's application for relief and ordered his removal to China. The IJ found that this case "has to do with eminent domain and the compensation that the government offered the respondent and the other property owners for property that the government intended to demolish," which is "not a matter that is political in nature." The IJ also found "nothing in this record to suggest that the respondent was being punished because he was voicing political objections to the way that the government was running."

The BIA upheld the IJ's decision, finding that Song failed to show that he was eligible for asylum because he "did not establish a nexus to a protected ground based on his personal dispute with the Chinese government over the value of his land." The BIA agreed with the IJ that Song's actions "were motivated by a desire for increased compensation for his property, not by political views."[8]

---

[8] The IJ and BIA also denied Song's applications for withholding of removal and CAT protection. The government contends that Song has

## III.

A petitioner is eligible for asylum when his imputed or actual political opinion was one central reason for his past persecution. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1); *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir. 2000). We uphold the BIA's determination of ineligibility if the findings are "supported by 'reasonable, substantial, and probative evidence on the record.'" *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). However, where the evidence "compels the conclusion that th[e] findings and decisions are erroneous," we must overturn the BIA's decision and grant the petition for review. *Id.*

There is no dispute here that Song experienced past persecution at the hands of the local government.[9] He was tortured and beaten by police, and by his cell mates at the encouragement of the police. He was forced to stay in a squatting position all night, and, when he refused to cooperate with interrogators, he was beaten until he could not walk. *See Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009) ("It is well established that physical violence is persecution under 8 U.S.C. § 1101(a)(42)(A)."). This appeal turns instead, then, solely on whether the persecution Song

---

waived any challenge to his eligibility for these other forms of relief. We agree as to the CAT claim because Song did not address the IJ's finding that the persecution he experienced did not rise to the level of torture. However, Song did not waive his withholding of removal claim. The IJ denied this claim for the same reason she denied asylum, and Song extensively addressed this issue on appeal.

[9] The IJ so found, and the BIA did not review nor dispute that finding. Nor have the parties raised the issue on appeal. *See* 8 C.F.R. § 208.13(b)(1).

suffered was on account of an imputed or actual political opinion.

## IV.

"If the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion as required under the [Immigration and Nationality] Act." *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997). The record compels the conclusion that the government officials at the protest and the police who arrested Song imputed to him an anti-government, anti-eminent domain political opinion, and that that imputation was one central reason for his persecution.

From the government's perspective, Song was the leader of a large group of local residents protesting the government's eminent domain policy. Song organized over one hundred people to block the entrance of a government building. He identified himself as a leader of the protest and told a government employee that the protestors were there specifically because they were subject to the government's eminent domain policy. He refused to disperse the crowd until the residents' concerns about the forced demolition of their building were heard. The Chinese government was familiar with such protests; the 2010 Human Rights Report confirms that forced relocation protests were "common" and that there was "widespread" animosity toward forced demolitions. It was in this context that government officials approached Song.

But we need not rely solely on the political atmosphere here to find that the government officials imputed a political opinion to Song; the officials said so themselves. A government official accused Song and the other protestors of being "anti-government." Police officers expressed the

same view when they accused Song of holding anti-government views in response to Song's assertion that the compensation he was offered was not consistent with government regulation. Thus, it is clear that the government officials and police attributed a particular view—one of being anti-government and anti-eminent domain—to Song. *See Singh v. Ilchert*, 69 F.3d 375, 379 (9th Cir. 1995) (finding persecution on account of political opinion when the persecutors' statements indicated they were acting because of the victim's political beliefs).

When Song intensified his protest of the forced demolition, so too did the government intensify its response. The police arrested, beat, and tortured Song when he hung a banner stating he would rather die than give up his property and refused to vacate. Song was jailed for three days. He was only released when his family was able to pay 10,000 Yuan and the injuries he had sustained from the beatings and torture required medical aid. The police required Song to report regularly to them after his release and continually sought him after he left the country. The government officials' disproportionate punishment for what was essentially a disturbing the peace charge also supports a finding that the persecution was because of an imputed political opinion. *See Li*, 559 F.3d at 1109 (observing that "disproportionately severe punishment" can transform an ordinary prosecution into persecution (internal quotation marks omitted)); *cf. Baghdasaryan v. Holder*, 592 F.3d 1018, 1024–25 (9th Cir. 2010) (concluding that petitioner suffered harm due to his political opinion when militia beat him and accused him of "raising his head" against a corrupt government official).

Whether or not Song viewed himself, his protest, or his refusal to vacate as anti-government, the government

officials made clear that they viewed them as such. *Cf. Cordon-Garcia v. INS*, 204 F.3d 985, 991 (9th Cir. 2000) (reversing BIA's determination that persecution was not on account of political opinion where victim's actions "demonstrated to the [persecutor] that she planned to continue alignment with a cause obviously at odds with [his] goals"). Accordingly, we find that the record compels the conclusion that the government imputed an anti-eminent domain opinion to Song, and persecuted him for that opinion.

In concluding otherwise, the IJ and BIA took a very narrow view of what could qualify as an actual political opinion in the asylum context. We have held that "[a] political opinion encompasses more than electoral politics or formal political ideology or action." *Ahmed v. Keisler*, 504 F.3d 1183, 1192 (9th Cir. 2007). The record makes clear that Song not only sought additional compensation for himself, but also staged a public protest of more than one hundred neighbors and a sit-in refusal to vacate his building, accompanied by a statement that he would die for the cause, in opposition to the demolition. The IJ and BIA narrowly focused on Song's "desire for increased compensation for his property" without taking into account the full spectrum of Song's actions.

\* \* \*

The evidence before the IJ and BIA compels the conclusion, at the very least, that Chinese authorities persecuted Song because of a political opinion they imputed to him. We therefore grant the petition for review, vacate the BIA's denial of asylum, and remand for consideration of

whether Song has met the other elements for asylum relief before exercising discretion whether to grant asylum.

**PETITION GRANTED.**