PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4116
_____

LONG HAO LI,
Petitioner

v.

ATTORNEY GENERAL
OF THE UNITED STATES,
Respondent
_____

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A099-934-740)
Immigration Judge:  Honorable Alberto Liefkohl
_____

Argued November 3, 2010

Before:  SCIRICA, RENDELL and ROTH, Circuit Judges

(Opinion Filed: February 1, 2011)
_____

Thomas V. Massucci, Esq.    **[ARGUED]**
Suite 908
401 Broadway
New York, NY  10013
   *Counsel for Petitioner*

Eric H. Holder, Jr., Esq.
Marion E. Guyton, Esq.
Thomas W. Hussey, Esq.
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box. 878
Ben Franklin Station
Washington, DC  20044

David N. Harling, Esq.    **[ARGUED]**
United States Department of Justice
Office of Immigration Litigation
450 5th Street, N.W.
Washington, DC  20001
    *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

RENDELL, <u>Circuit Judge</u>.

Longhao Li, a citizen and national of China who is ethnically Korean, seeks withholding of removal based on his fear of persecution for violating Chinese laws forbidding citizens from providing assistance to illegal immigrants from North Korea.  Li presented testimony that he assisted North Korean refugees, that Chinese authorities sought to arrest him, and that he fled to the United States to avoid arrest.  Li concedes that he violated Chinese law, but argues that his arrest and prosecution for that violation would amount to

persecution "because of" his political opinion, thus satisfying the requirements for withholding of removal.

Under our precedent, prosecution under a generally applicable law can provide the basis for withholding of removal, but only where the petitioner establishes a connection between the prosecution and his or her political opinion, such that the persecution (if shown) would be "because of" that opinion. In this case, the law at issue is a generally applicable law that penalizes people for assisting those who cross the border illegally. It does not automatically raise political concerns. Moreover, Li has not offered any specific evidence concerning his political opinions, the Chinese government's awareness of those political opinions, or the nature of the government's enforcement of the law that would raise suspicion that the prosecution of Li for violating that law would relate to a political opinion. Because Li failed to adduce evidence that raises an inference of political persecution, as opposed to legitimate prosecution under Chinese law, and because substantial evidence supports the BIA's determination that Li failed to establish a clear probability of persecution, we will deny his petition for review.

**I.**

Li entered the United States without authorization at an undetermined date and location. On April 20, 2007, he applied for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and protection under the Convention Against Torture. Li claimed that he would be arrested and jailed for helping North Korean refugees cross the border into China if

3

he returned to China.  Li conceded that his conduct was illegal under Chinese law.

To support his application, Li submitted:  an affidavit describing the particulars of his claims; various forms of identification establishing certain biographical facts; an affidavit from his wife attesting to circumstances surrounding his arrival in New Jersey; a translated letter from his mother, who still lives in China, stating:  "All you did was to help pitiful people who were in awkward position.  How can it be such a crime that police is after you to arrest"; a two-page article from an organization called "HighBeam Research" and a report from a non-governmental organization called the International Crisis Group describing the plight of North Koreans who try to escape from North Korea, including those who cross the border into China; and an excerpt of a China "Country of Origin Information Report" published by the United Kingdom Home Office Border & Immigration Agency.

Among these materials, only the Home Office report provides any detail regarding the consequences for those who *assist* North Korean refugees, as opposed to the refugees themselves.  Quoting what appears to be a 2006 United States State Department Report, the Home Office report states:

> "(However), the [Chinese] government continued to deny the UNHCR permission to operate along its northeastern border with North Korea, arguing that North Koreans who crossed the border were illegal economic migrants,

4

not refugees. During the year several thousand North Koreans were reportedly detained and forcibly returned to North Korea. Many faced persecution, and some may have been executed upon their return. Several hundred North Koreans were permitted to travel to third countries after they had entered diplomatic compounds or international schools in the country. There were numerous credible reports of harassment and detention of North Koreans in the country. *The government also arrested and detained foreign journalists, missionaries, and activists, as well as some citizens, for providing food, shelter, transportation, and other assistance to North Koreans.*"

A.R. 207 (emphasis added).

The Immigration Judge held a merits hearing on Li's claims on February 1, 2008.[1] As relevant here, Li testified

---

[1] The IJ denied Li's asylum claim because he found that Li failed to establish that he submitted his application within one year of his arrival in the United States as required under 8 U.S.C. § 1158(a)(2)(B), and the BIA affirmed that decision on appeal. Because Li's petition for review does not challenge the

5

regarding his "main purpose" in coming to the United States as follows: "[i]f I had stayed in China I'll be arrested by the police and sentenced to serve time in jail . . ." because "I did something illegal." A.R. 128-29. When asked what he did that was illegal, Li testified, "I help a lot of refugees from North Korea. Help them . . . smuggle to the United States." A.R. 157. Specifically, Li explained that, over the course of a two-year period, he drove to the Chinese border with North Korea, where he picked up North Korean refugees crossing the river into China and transported them in his car or his company's minivan to a person who would arrange food, shelter, and work for the refugees. A.R. 160-64.

Li testified, further, that he left China after an incident at the border in May 2006. Li drove his car to the border crossing to pick up refugees. As he waited in his car, Li watched the police descend and arrest the refugees and Li's colleague, who was bringing the refugees to Li's car. Li fled the scene in his car and, later, abandoned his car and returned to the city by taxi. Fearing arrest, he did not return home; instead, he hid at a friend's house for ten days before deciding to come to the United States. Li testified that his colleague was sentenced to ten years in jail in connection with this incident and that, shortly thereafter, his contact who helped provide food, shelter, and work for the refugees also was arrested. Li testified that his mother told him that authorities visited her house and intended to arrest him, too. A.R. 164-68.

In an oral decision at the conclusion of the merits hearing, the IJ granted statutory withholding of removal to

denial of his asylum claim, we do not consider the facts surrounding that decision.

Li.[2]  The IJ summarized the "literature" regarding the Chinese government's policy of returning North Korean immigrants to North Korea and North Korea's treatment of returning refugees, opining that "the government of North Korea is in some cases punishing some of these individuals in a manner that is not associated by the fact that they had violated immigration laws.  An assessment of a sentence or hard work or labor for such a violation clearly offends the analysis of the Court."  A.R. 85.  Apparently referring to the Home Office report quoted above, he continued, "one of the last analysis by the Department of State of the United States they admit that the main action or the main directive by the People's Republic of China is to individuals that are assisting in this type of operation on the other side of the fence and that will be the respondent."  *Id.*  The IJ concluded that Li had met the standard for statutory withholding because, "assuming that the police apparently knows about his operation and the use of private equipment from his company in the operation of smuggling these citizens of North Korea may be or may resolve in some severe punishment to him that could affect his liberty or even his life."  A.R. 86.

The Board of Immigration Appeals reversed, for two reasons.  First, the BIA held that Li failed to establish a sufficient nexus between his fear of persecution and his political opinion.  Noting Li's admission that he acted illegally in helping refugees enter China and his failure to "establish[] that the Chinese government's prohibition of such

---

[2]  The record of the IJ's oral decision contains some strange phrasing and usage, which may be the result of poor transcription.  The quotes used here are reproduced verbatim from that record without editing.

7

smuggling is based on an enumerated ground," the BIA concluded that Li "faces being the subject of a legitimate government investigation, and could be legitimately detained and/or prosecuted for a crime, which is not persecution." A.R. 4 (citing *Chang v. INS*, 119 F.3d 1055 (3d Cir. 1997)). Second, the BIA concluded that Li failed to establish "a clear probability of persecution." It stated that Li "did not show that the Chinese government was aware that he was involved in the smuggling operation and still maintained an interest in persecuting him because of his involvement." A.R. 4.

## II.

Li's petition for review challenges both the BIA's determination that Li failed to demonstrate a likelihood of persecution on account of his political opinion and its conclusion that he failed to establish a clear probability of persecution.

We have jurisdiction to review a final order of removal under 8 U.S.C. § 1252(a)(1). Where, as here, our review "does not turn on any novel legal interpretation by the [BIA] and instead involves the [BIA]'s fact-finding and application of established legal standards, we will reverse the [BIA]'s decision to deny . . . withholding of [removal] 'only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed.'" *Lin v. INS*, 238 F.3d 239, 243 (3d Cir. 2001) (quoting *Chang*, 119 F.3d at 1060); *see also* 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."); *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) ("[I]f [an alien] seeks to obtain judicial reversal of the BIA's determination,

8

he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.").

Before considering the merits of Li's petition, we briefly review the standard for statutory withholding of removal, the only substantive claim remaining in this case. [3] The INA provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This standard is similar to, but more stringent than, the standard for asylum. Whereas an asylum applicant need only establish a "well-founded fear" of persecution, a withholding applicant must establish a "clear probability" that his life or freedom would be threatened because of an enumerated characteristic. "'Clear probability' means that it is 'more likely than not' that an alien would be subject to persecution." *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir. 2003) (quoting *INS v. Stevic*, 467 U.S. 407, 429-

---

[3] As noted above, Li's petition for review does not challenge the BIA's denial of his asylum claim. Although Li's brief contains several stray references to his CAT claim, he has not made any separate arguments concerning that claim or pointed to any evidence that would compel a different result. We therefore conclude that he has waived any challenge to the BIA's denial of that claim. *See Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'" (citation omitted)).

30 (1984)). Unlike asylum, withholding of removal is a *mandatory* remedy; once an alien carries his or her burden to establish a clear probability of persecution on account of an enumerated ground, *see* 8 C.F.R. § 1208.16, the Attorney General must grant the relief, *see Zubeda*, 333 F.3d at 469.

### III.

Li first argues that the BIA erred in concluding that he failed to establish that any persecution he might face in China is "because of" his political opinion. Li concedes that he violated a generally applicable Chinese law, but argues that, by helping North Korean refugees, he was engaged in a "quintessentially political gesture." Pet.'s Br. 11. Without citing any material in the record, he asserts in his brief that, "[g]iven China's generally abysmal human rights record, and its specifically harsh handling of the Korean refugee situation, there is no question that any actions to be taken by the Chinese government against Li would be political in nature, against someone who has, through his acts, defied China's ongoing efforts to circumvent international human rights and refugee law." *Id.*

The question before us is not whether the Chinese government's prosecution for the violation of a generally applicable law under these circumstances *could* provide the basis for a withholding of removal claim — our caselaw, which the BIA cited and applied, plainly establishes that it could. The real question is whether Li provided sufficient record evidence to establish that, *in his case*, prosecution would be on account of his political opinion. We agree with the BIA that he did not. At the very least, the evidence Li

provided certainly would not *compel* any reasonable factfinder to reach a conclusion contrary to that of the BIA.

**A.**

The BIA correctly identified the standard for establishing withholding of removal based on a violation of a generally applicable law. "As a general matter, . . . we have held that fear of prosecution for violations of 'fairly administered laws' does not itself qualify one as a 'refugee' or make one eligible for withholding of [removal]." *Chang v. INS*, 119 F.3d 1055, 1060 (3d Cir. 1997) (citations omitted). As the BIA recognized, however, "under certain circumstances, prosecution under laws of general applicability may provide the basis for withholding of removal." A.R. 4 (citing *Chang*, 119 F.3d at 1060). "To provide a basis for withholding of removal, a generally-applicable law must be based on an enumerated ground and the punishment must be sufficiently extreme to constitute persecution." A.R. 4 (citing *Chang*, 119 F.3d at 1061).

Of course, simply articulating the appropriate standard does not end the analysis. The next step is to determine whether the law or the Chinese government's enforcement of it is "based on" Li's political opinion. An alien need not "provide direct proof of his persecutors' motives." *Elias-Zacarias*, 502 U.S. at 483. "But since the statute makes motive critical, he must provide *some* evidence of it, direct or circumstantial." *Id.* We have previously observed that "the nature of the statute being enforced" and "the actions that" the alleged persecutor "sought to compel by that statute" may "help determine the motives of the alleged persecutor." *Chang*, 119 F.3d at 1063.

11

Our opinions in *Chang v. INS*, 119 F.3d 1055 (3d Cir. 1997), and *Lin v. INS*, 238 F.3d 129 (3d Cir. 2001), provide examples of the type of evidentiary showing required to sustain a substantial evidence challenge to a BIA finding that the persecutor was not motivated by political opinion. In *Chang*, a chief engineer for a state-owned company led a delegation from China to the United States in 1992. Before the trip, a Chinese special security agent specifically instructed Chang to monitor and report to the Chinese Embassy any suspicious activity by his fellow delegates. Chang declined to do so. After meeting with FBI agents in the United States, who told Chang that, as a result of his actions, he was "in danger" of future mistreatment by the Chinese government, Chang decided to stay and seek asylum in the United States. *Id.* at 1057-58.

We held that the evidence compelled the conclusion that China's motive in prosecuting Chang would be "in part, political."[4] *Id.* at 1065. A Human Rights Watch/Asia report

---

[4] Our analysis in *Chang* turned in part on our conclusion that Chang needed only to prove that China was motivated "at least in part" by Chang's political opinion. *See* 119 F.3d at 1065. That portion of our analysis has since been superseded by REAL ID Act amendments to the INA, which provide that an asylum applicant "must establish that . . . political opinion was or will be at least *one central reason* for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added); *see generally Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 130 (3d Cir. 2009). Under the REAL ID Act standard, an applicant must establish more than that the persecutor is motivated "in part" by a protected ground; "asylum may not be granted if a protected ground is only an 'incidental, tangential, or superficial' reason

12

included in the record and quoted in the opinion stated that "'the principal objective'" of China's Security Law, under which Chang feared prosecution, "'appears to be to frighten dissidents into halting their activities.'"[5] *Id.* at 1064. That evidence was bolstered by a State Department report that indicated continuing political repression in China and Chang's "unique situation," specifically the facts that "the Chinese government entrusted him with politically sensitive obligations to limit the freedoms of other delegates" and that he "refused to comply" with those obligations "because he disagreed with the punishment that the government would mete out for violations." *Id.* We summarized the evidence as follows: "[Our] conclusion is based on the statute itself, which provides potentially harsh punishment for mere violation of the exit laws, on the responsibilities with which Chang was entrusted, on the appearance of disloyalty and political opposition as a result of Chang's actions, and on Chang's actual motivations in breaking China's laws." *Id.*

In *Lin*, we likewise concluded that the petitioner, also a Chinese citizen, had presented sufficient evidence to warrant a reversal of the BIA's ruling denying his applications for asylum and withholding of removal. Lin was a fifteen-year-old middle school student when, in 1989, he took a "very active" role in student marches protesting the Chinese

for persecution of an asylum applicant." *Id.*

[5] Although we relied in part on the Human Rights Watch/Asia report, we acknowledged that "the use of materials prepared by [a] 'watchdog' organization is not without its problems." *Chang*, 119 F.3d at 1064 (citing *M.A. v. INS*, 899 F.2d 304, 313 (4th Cir. 1990)).

13

government's "corruption, undemocratic rule, and disregard for human rights" in his native Fujian Province. 238 F.3d at 241. Lin participated in a series of marches in May and June 1989, during which he and others attempted to occupy a county government building and were beaten back by officers and soldiers wielding electric batons. *Id.* at 241-42. On June 4th, 1989, the student protest movement ended with a massacre of student protesters in Tiananmen Square. *Id.* at 242.

Lin went into hiding in China and ultimately emigrated to the United States. He presented detailed evidence of his ordeal to support his asylum and withholding of removal claims, including a copy of a subpoena (issued six days after the events in Tiananmen Square, *see id.* at 245) demanding that Lin appear for interrogation at the Security Section of the Public Security Bureau, testimony that officers visited Lin's home on six occasions looking for Lin and that they detained Lin's mother seeking information about his whereabouts, and testimony that Lin's classmates were arrested, beaten, and sentenced to detention and forced labor for their participation in the student movement. *Id.* at 242-43. Lin testified, further, that the officers who visited his mother repeatedly mentioned Lin's involvement in the student movement. *Id.* at 242.

Reviewing this evidence, we held that the BIA's conclusion that the police sought to prosecute Lin "only for trespass," not on account of his political opinion, was "wholly unsupported by the record." *Id.* at 244. We based our assessment on Lin's testimony that police officers specifically referenced his participation in the student democracy movement when they interrogated his mother, the mistreatment to which his classmates were subjected, the

14

government's interrogation of Lin's mother and its six visits to his home over a year-and-a-half long period, and the context of the broader, nationwide political repression that followed the Tiananmen massacre. *Id.* at 244-45.

**B.**

This case is very different from *Chang* and *Lin*. As a preliminary matter, we do not even have enough information to conduct the type of analysis we performed in *Chang* and *Lin*. The record does not identify the precise statute or even provide any general information about the law under which Li fears prosecution.[6] All we know is that, by his own

---

[6]

At argument, Li's counsel, apparently relying on *Li v. Holder*, 559 F.3d 1096, 1110 (9th Cir. 2009), argued for the first time that assisting North Koreans who cross the border is not illegal under Chinese law. Numerous factors, including Li's failure to raise that issue before the IJ and BIA and the assertions to the contrary in his brief to this Court, *see* Pet'r's Br. 11, preclude us from considering that argument.

Without addressing this waiver problem, our dissenting colleague asserts that this "gap" in the record provides an independent basis for remand, *see* Dissenting Op. 6-7, because the Government, not Li, bore the burden of producing evidence concerning the applicable Chinese law, *see id.* at 1. That assertion is contrary to the well established standards that the alien, not the Government, bears the burden of proof on a withholding of removal claim, *see Zubeda*, 333 F.3d at 469, and that, to "obtain judicial reversal of the BIA's determination," an alien "must show that the evidence he presented" to the BIA "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S.

15

admission, Li's conduct was illegal, A.R. 129, 170, and that, according to a United Kingdom government report of what the United States State Department has said, the Chinese government has "'arrested and detained foreign journalists, missionaries, and activists, as well as some citizens, for providing food, shelter, transportation, and other assistance to North Koreans,'" A.R. 207. The sum total of those facts — that Chinese law penalizes people who assist others who cross the border illegally — does not automatically raise the same sort of political concerns as the laws involving controls on people leaving the country or political expression implicated in *Chang* and *Lin*.

Indeed, in this case, unlike in *Chang* or *Lin*, no record evidence suggests that the law's objective is to silence or punish political dissent. To the contrary, the record suggests that the Chinese government views North Korean immigrants as "illegal economic migrants" and is concerned that "a steady stream of border crossers" could "become a flood,

at 483-84.

The Ninth Circuit Court of Appeals adhered to those standards in *Li*, when it held that the IJ's conclusion that Li's previous detention for assisting North Korean immigrants violated Chinese law was contrary to *record evidence* in the form of sworn affidavits from two Chinese legal experts *that the petitioner had presented to the IJ*. 559 F.3d at 1110. Critically, Li presented no similar evidence in this case. In light of the law that governs our review in this area, his failure to provide meaningful information regarding the content of the applicable Chinese law only underscores our conclusions that Li failed to produce sufficient evidence to support his withholding claim and, more to the point, that the record evidence in this case does not compel us to reach a finding contrary to that of the BIA.

16

causing economic havoc in the [border] region and possibly stoking latent Korean nationalism there." A.R. 213-14. Viewed in this light, and without any additional information, a generally applicable Chinese law designed to deter Chinese citizens from assisting North Korean migrants can reasonably be interpreted as a rational policy response to a serious immigration problem, similar to steps that other countries take to protect their own borders. In fact, as the Government pointed out in its brief to the BIA, United States law also provides criminal penalties, *including up to ten years in prison*, for bringing in, transporting, or harboring aliens in the United States in violation of the immigration laws. *See* A.R. 46 (citing 8 U.S.C. § 1324).

Nor does Li provide any detail about his own political opinions, about the Chinese government's awareness of those political opinions, or about the government's enforcement of the law that compels the conclusion that any prosecution in his case would be politically motivated. Li testified only that he broke the law by assisting North Korean refugees; that some of his colleagues were arrested and sentenced to ten years in prison for breaking the law; and that police knew about Li's activities and sought to arrest Li for breaking the law. This evidence is at least as consistent with fear of legitimate prosecution for smuggling as it is with targeted persecution on account of a political opinion.

Li's testimony did not touch on his motivation to help the North Korean refugees, but the affidavit attached to his asylum application suggests that his concerns were humanitarian. After describing the Chinese government's policy of deporting North Koreans who enter China illegally, Li stated, "I asked myself, since the Chinese government is

17

unwilling to help, shouldn't I do my best to assist them?" A.R. 291. Li's mother also cast his actions in humanitarian terms: "All you did was to help pitiful people who were in awkward position. How can it be such a crime that police is after you to arrest[?]" A.R. 237. We recognize that "a humanitarian or charitable act may signify a humanitarian or charitable conviction; and a government might construe [a] violation of law as opposition or resistance to the law's underlying policy, and punish it accordingly." *Jin Jin Long v. Holder*, 620 F.3d 162, 167 (2d Cir. 2010). But surely any prosecution involving a humanitarian act cannot be *presumed* to be politically motivated. Indeed, without any evidence concerning the government's motivation in enforcing the law, a government prosecution of a violation of the law would seem to be based on legitimate law enforcement concerns. In this case, Li simply has not provided any facts to suggest that prosecution would be because of any opposition or resistance to the law's underlying policy, rather than appropriate administration of the law.[7]

---

[7] Judge Roth's assertion that our analysis in this regard "all but abandons *Chang*," Dissenting Op. 3, is incorrect. Our conclusion in *Chang* that the petitioner was entitled to asylum and withholding of removal was based on more than a determination that Chang acted out of a humanitarian instinct; we also considered record evidence concerning the specific Chinese law at issue, State Department and private human rights reports bolstering Chang's claims, and the unique features of Chang's situation that, taken together, established that the Chinese government's motivation for prosecuting Chang was "in part, political." *See Chang*, 119 F.3d at 1064-65. No such evidence bolsters Li's claim in this case.

Specifically, Li presents none of the indicia of political motivation on the part of the Chinese government that the law requires. We are not presented with the type of "unique situation" involving special government responsibilities and confirmation by the FBI that the petitioner was in a politically precarious position we considered so persuasive in *Chang*, or evidence that police were seeking to punish the petitioner through beatings or forced labor as a direct consequence of participating in a political demonstration, as we confronted in *Lin*. Therefore, we cannot conclude, as we must to grant the petition for review, that Li's evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 483-84.

## C.

At oral argument, Li's counsel took the position that the Chinese government's position on North Korean refugees is so abhorrent that withholding of removal should be automatic for any Chinese citizen who helps North Korean refugees and, to some extent, our dissenting colleague suggests the same result.[8] The logical upshot of such a ruling,

---

[8] To be sure, the dissenting opinion asserts that the record "compels" the conclusion that Li's "humanitarian interest in assisting North Korean refugees" was "at least one central ground for the Chinese government's attempt to arrest him" because it concludes that the record shows that "China's treatment of immigration by North Koreans and assistance to such immigrants is harsh, politicized, and far from evenhanded." Dissenting Op. 8, 11. But we are unwilling to conclude that China's enforcement of its immigration laws is "harsh, politicized, and far from evenhanded" simply because China

19

however, would be that every Chinese citizen who helps North Korean refugees would qualify automatically for asylum or withholding of removal. But our law plainly requires more. As we noted above, absent "*some* evidence . . ., direct or circumstantial" of his persecutors' motives, an alien may not succeed on an asylum or withholding of removal claim. *Elias-Zacarias*, 502 U.S. at 483.

Applying that principle, we and other courts of appeals have granted petitions for review in cases involving claims similar to Li's only where *the petitioners adduced specific evidence that supported their claims*; in the case of asylum or withholding of removal claims, this means specific evidence that at least raises an inference of political persecution. For example, in *Jin Jin Long v. Holder*, 620 F.3d 162, 167-68 (2d Cir. 2010), the Second Circuit Court of Appeals granted a petition for review and ordered the BIA to consider whether facts related to the Chinese petitioner's previous arrest and detention supported an inference that the petitioner was "persecuted for political reasons, rather than punished for legitimate law enforcement purposes." There, the evidence showed that, "though neither charged nor presented in court,

_____

may previously have imposed less severe penalties for violations of the law. *See id.* 9-10 (citing fact that penalties for assisting with North Korean immigration increased from relatively modest fines to jail sentences of up to ten years as evidence of "disproportionately severe punishment"). For all we know based on this record, the Chinese government could have responded to the escalating crisis of North Korean immigration by increasing the applicable legal penalties for assisting with such immigration. The record simply does not provide us with sufficient information to conclude (let alone for us to find that the record *compels* the conclusion) that the increased penalties flow from unfair administration of the law.

[the petitioner] was subjected to prolonged detention and physical abuse." *Id.* Similarly, in *Kang v. Attorney General*, 611 F.3d 157, 166-67 (3d Cir. 2010), we granted a petition for review and held that the evidence compelled a finding that the petitioner met her burden of establishing a CAT claim where she provided affidavits from similarly situated individuals detailing their detention and torture and testimony and an affidavit concerning police beating and torture of her son to elicit information about the petitioner. And, in *Li v. Holder*, 559 F.3d 1096, 1111-12 (9th Cir. 2009), the Ninth Circuit Court of Appeals granted a petition for review based on the petitioner's claim that he was persecuted on account of his political opinion for helping North Korean refugees because he provided "direct evidence of officers' motivation in the record — the officers specifically interrogated Li about why and how he had helped the North Koreans while they were brutalizing him." *Id.*

By contrast, in other cases involving Chinese citizens who have assisted North Korean refugees, courts of appeals have not hesitated to deny petitions for review that were not supported by specific evidence raising an inference of political persecution. *See, e.g.*, *Jin*, 620 F.3d at 168 (holding that petition "fails on the essential ground that there is little (if any) evidence that [alien] acted from a political motive" where alien testified that he "did not believe that assisting North Korean refugees was illegal until after his assistance was completed"; alien acted out of "independently sufficient motive of family loyalty"; and alien, like Li in this case, fled "before encountering the authorities investigating his conduct"); *Li*, 559 F.3d at 1098 n.1 (noting that Li's petition was consolidated with two other petitions involving "Chinese citizen[s] of North Korean descent who [were] allegedly

persecuted for giving aid, food, and shelter to North Korean refugees," and granting relief to only one of the three petitioners). Because Li has not presented any specific evidence of past mistreatment or any details regarding the government's administration of the law or the arrest and detention of his colleagues that suggest that his prosecution would be anything other than a legitimate prosecution for a violation of the law, his case plainly falls within the latter category.[9]

We emphasize that our decision is based solely on the lack of compelling evidence of a political motive for prosecution *in this case*. Although we disagree with Li's counsel that an alien who testifies that he or she assisted North Korean refugees *automatically* establishes a withholding of removal claim, we certainly do not suggest that a Chinese citizen who has assisted North Korean refugees can *never* establish such a claim. In each case, the question is whether the alien has provided evidence sufficient to establish an inference that he or she would be persecuted "*because of* the alien's . . . political opinion." 8 U.S.C. § 1231(b)(3)(A)

---

[9]

We would agree with Judge Roth's view that the case should be remanded to consider whether the prosecution Li fears is a mere pretext for persecution, *see* Dissenting Op. 9-10, but for the fact that it was Li's burden to prove his claim, *see Zubeda*, 333 F.3d at 469. Li conceded the existence of the law, and he neither made any argument nor adduced any proof to suggest that the law was pretextual as applied to him. These facts distinguish Li's case from the Second Circuit's decision in *Jin Jin Long v. Holder*, 620 F.3d 162, 164 (2d Cir. 2010), and the Ninth Circuit's decision in *Li v. Holder*, 559 F.3d 1096 (9th Cir. 2009). *See supra* 21.

(emphasis added).  Where, as here, the alien has not adduced such evidence, we will deny his or her petition for review.

## IV.

In addition to challenging the BIA's determination concerning the nexus between his political opinion and his alleged persecution, Li also asserts that the BIA's determination that he failed to establish a clear probability of persecution is unsupported by substantial evidence.  Li barely argues the point in his brief and, because our conclusion with respect to the political opinion issue is dispositive of Li's petition for review, we only briefly consider this issue here.

As explained above, the "'clear probability'" standard for withholding of removal requires an alien to establish that "it is 'more likely than not'" that "the alien would be subject to persecution." *Zubeda*, 333 F.3d at 469 (citation omitted). The BIA held that Li failed to establish a "clear probability of persecution" because he "did not show that the Chinese government was aware that he was involved in the smuggling operation and still maintained an interest in persecuting him because of his involvement."  A.R. 4.  As the Government conceded at oral argument, Li did provide some testimony and a letter from his mother that indicated that the Chinese authorities sought to arrest him based on his activities with the North Koreans.

Even taking that evidence into account, however, Li cannot show that the record compels a contrary result, as he must to succeed on his petition for review. *See Shardar v. Ashcroft*, 382 F.3d 318, 323 (3d Cir. 2004) (BIA's determination whether alien has met his burden of proof "will

23

be upheld to the extent it is supported by 'reasonable, substantial and probative evidence on the record considered as a whole'" (citations omitted)). The record discloses only that authorities came looking for Li once, shortly after they arrested his colleague. At the same time, the record also contains evidence that, after he came to the United States, Li contacted the Chinese government, applied for, and received a Chinese passport without any difficulty. *See* A.R. 182-83. Thus, the record as a whole does not compel the conclusion that police have continued to pursue his case in the several years since he left, or that they would more likely than not seek to persecute him on his return.

## V.

For the foregoing reasons, we will deny Li's petition for review.

**ROTH**, Circuit Judge, Dissenting:

The Majority and I agree that there is a glaring omission in the record: evidence of the generally applicable law that the BIA cited as the source of China's interest in Li. The Majority tries to pin this omission on Li. However, it is not Li who is arguing that any generally applicable law is involved here. The Immigration Judge did not discuss any such law or rely upon one in its decision granting withholding of removal. Mention of a generally applicable law appears in the record before us for the first time in the government's brief before the BIA. The government has not, however, indicated what specific law it had in mind. Because it is the government that is arguing that China seeks to prosecute Li under a law of general applicability, it is the government that must bear the initial burden of identifying the law it has in mind and producing evidence to support its theory. The omission in the record of a generally applicable law does not count towards the ultimate burden Li bears in establishing his claim for withholding of removal. To the contrary, this omission eviscerates the government's argument for denial of the petition for review.

Moreover, the record before us suffices to support Li's petition and compels three essentials conclusions: (1) Li manifested his political opinion in assisting North Korean refugees; (2) he faces a clear probability of enduring treatment severe enough to amount to persecution; and (3) his political opinion serves as at least one central reason China seeks to persecute him. Li's petition does not depend on his demonstrating a law of general applicability. For these reasons, I respectfully dissent.

**A. Li's Political Opinion**

The record clearly establishes that Li held a political opinion in opposition to China's policy towards North Korean refugees. The instant case invokes *Chang v. I.N.S.*, 119 F.3d 1055 (3d Cir. 1997), where we confronted a petition for asylum and withholding of removal from a Chinese national who had violated China's generally applicable exit laws and refused to report others who had violated those same laws. There, we stated:

> To argue that Chang is prosecuted merely for "breaking the law" and not on "political" grounds is to turn a blind eye to the motives of the government. Those motives are, at least in part, to punish those, like Chang, who have manifested opposition to the policy of the Chinese government and to prevent others from taking similar political actions.

*Chang*, 119 F.3d at 1065. While the standards for granting asylum and withholding of removal have shifted in the years since, *Chang* retains its salience today and applies with equal force to the instant Petition for Review.

By assisting North Koreans refugees not for monetary compensation, but because he sympathized with their plight, Li manifested his opposition to the policies of the Chinese government. *See id*. The Majority presents a false choice between Li's humanitarian and political motivations. *See ante*, 18-19. In this case, as in *Chang*, the two are one and the same. In his testimony before the IJ and in the affidavit submitted with his asylum application, Li demonstrated that he is acutely aware of the poverty and starvation endemic to North Korea and that he believes China is "obligated to . . .

2

protect human rights and provide asylum to the [North Korean] refugees." (A.R. 291 (affidavit); *see also* A.R. 161 (testimony).) Li's actions, moreover, speak louder than his words. Despite the risk of grave punishment, Li's willful disobedience of China's policy towards North Koreans based on conscientious – rather than pecuniary – motives indicates a political belief. In other words, a humanitarian action in knowing violation of a state policy constitutes opposition to that policy, and therefore, reflects a political belief.[1] A conclusion to the contrary all but abandons *Chang*. *See* 119 F.3d at 1065.

### B. A Clear Probability of Being Subjected to Persecution

The assertion that Li failed to establish by a clear probability that he would be subject to persecution is not reasonably grounded in the record. Rather, the record demonstrates that the Chinese government knows of Li's assistance, threatens punishment severe enough to constitute persecution, and maintains an interest in arresting him. At the merits hearing, Li testified that, while in hiding after his escape from police, he learned from his mother that police had visited their home to arrest him. (A.R. 165, 167.) In a subsequent letter to Li, his mother mentioned again that the police seek to arrest Li for the assistance he provided to North Koreans who had crossed into China. (A.R. 179, 237.) Li

---

[1] I note that Li's actual political opinion, or China's knowledge of his actual political opinion, may be inconsequential where China has imputed one to him. *See Espinosa-Cortez v. U.S. Atty Gen.*, 607 F.3d 101, 108-09 (3d Cir. 2010).

3

further testified that his fellow dissidents received ten-year jail terms and that he likely would receive the same punishment if he were to return. (A.R. 165, 168).[2] Thus, as the Majority all but says outright, the BIA incorrectly concluded that Li "did not show that the Chinese government was aware he was involved in the smuggling operation." *Ante*, 21 (citing A.R. 4); *see also Kang*, 611 F.3d at 163-64, 166 (concluding that the substantial evidence standard called for reversal of BIA's findings where BIA appeared to ignore forceful evidence in support of applicant).

The harm Li fears from the Chinese government – ten years of imprisonment – amounts to a deprivation of freedom that rises to the level of persecution. "Our oft-quoted, non-exclusive list of examples of persecution 'include[s] threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.'" *Cheng v. U.S. Atty Gen.*, 623 F.3d 175, 192 (3d Cir. 2010) (quoting *Fatin v. I.N.S.*, 12 F.3d 1233, 1240 (3d Cir.1993). Ten years of imprisonment constitutes a period of confinement greater than past instances where this Court found persecution. *See Chang*, 119 F.3d at 1067 (concluding that punishment of up to one year of imprisonment is "sufficiently severe to constitute 'persecution' under this Circuit's standard . . . ."); *see also Gomez-Zuluaga v. U.S. Atty Gen.*, 527 F.3d 330, 342 (3d Cir. 2008) (finding that abduction and eight-day confinement, during which she was threatened, tied to a bed, and

---

[2]

We must credit Li's testimony. Where, as here, "an IJ or the BIA fails to make an explicit credibility finding, [the Court] . . . proceed[s] as if the applicant's testimony were credible." *Toure v. U.S. Atty Gen.*, 443 F.3d 310, 326 (3d Cir. 2006).

4

blindfolded, rose to the level of persecution); *Li Wu Lin*, 238 F.3d 239, 248 (3d Cir. 2001) (finding that "a year and a half incarceration and forced labor for a fifteen-year old who voiced opposition to the government" constituted a sufficiently severe deprivation that amounted to persecution).

Despite the BIA's error in concluding that the Chinese government was not aware of Li's involvement in the operation, the Majority stills finds that the record does not demonstrate a clear probability of persecution. In reaching this conclusion, the Majority notes that Li successfully applied for and obtained a Chinese passport from the Chinese Consulate in New York, suggesting that China's interest in persecuting Li has dissipated. *See ante*, 24 (citing A.R. 182-83.). But the Majority omits that Li paid a "broker" to accompany him to the Consulate and to ensure that he would be able to obtain a passport. This undermines the use of this evidence to support the inference that China has lost interest in Li. (A.R. 132, 182-84.)[3] In addition, the ten years of imprisonment that Li potentially faces indicates how severely China may punish such conduct and renders it unlikely that China would disregard such a perceived offense. Moreover, there is no evidence in the record that China's interest in

---

[3] I note further that, even if Li had not relied on the assistance of a "broker," China's willingness to issue Li a passport is consistent with an intent to persecute Li. Granting Li's passport application would increase Li's likelihood of returning to China, which would provide the Chinese government the best opportunity to apprehend him. Refusing to grant the passport application would prevent Li from entering China on his own volition and therefore prevent China from arresting Li.

5

persecuting Li has lessened with time, nor of any amelioration in China's treatment of those who assist North Korean refugees. (A.R. 168.)

## C. Political Opinion as at Least One Central Reason for Persecution

In reaching its conclusion, the Majority ultimately relies on the BIA's finding that Li did not face persecution, but prosecution under a generally applicable law. In my view, this finding reads too far into a sparse record and oversimplifies the distinction between persecution and prosecution.

First, the record is remarkably silent on the generally applicable law that Li supposedly defied. And the BIA did not point to any provision of Chinese law that Li violated in concluding that China sought to prosecute, not persecute, Li under a law of general applicability. As the Second Circuit recognized in *Long v. Holder*, this point alone merits remand to the BIA and, pursuant to 8 CFR § 1003.1(d)(3)(iv), possible remand to the IJ, for further consideration of the relevant Chinese law. 620 F.3d 162, 164, 168 (2d Cir. 2010). The only evidence that Li violated any law at all comes from his own, limited testimony to that end. *See ante*, 6 (citing A.R. 128-29, 157.). But Li is not a lawyer and did not state what law he violated. It appears the only reason he thought he did something illegal was because other members of his organization had been imprisoned. Moreover, even if Li's testimony is literally true, it does not establish that he violated a law that carries a penalty of ten years in prison.

This gap in the record is particularly troubling in light

6

of *Li v. Holder*, 559 F.3d 1096, 1111 & n.15 (9th Cir. 2009), which found that there is no Chinese law punishing assistance to North Korean refugees. Although the Ninth Circuit found that smuggling of refugees is an offense in China, *see id.* at 1111 n.15, the record does not establish that Li participated in smuggling North Korean immigrants across the border. It is admittedly conceivable that, as the Majority and the BIA appear to have assumed, China's smuggling law is drafted broadly enough to reach Li's conduct.[4] But in the absence of the text of the law or evidence about its scope, this conclusion cannot be based on substantial evidence. This assumption is all the more suspect, as record evidence demonstrates that Li held a political motivation for supporting the immigration of North Koreans, and documents China's practice of harshly punishing individuals accused of assisting North Korean refugees for political motives. (*See* A.R. 207-09.)

Second, the Majority overlooks several nuances in the distinction between prosecution and persecution. The Majority correctly states that prosecution under a generally

---

[4]

The Majority's speculation about Chinese law based on United States law providing criminal penalties for bringing in, transporting, or harboring aliens simply underscores the lack of evidence in the record. *See ante*, 17. As *Chang* and the numerous cases granting asylum to Chinese citizens establish, China's laws can be very different from our own, thus making persuasive comparisons unlikely. Even if our law were somehow relevant here, because Li obtained no private financial gain from transporting aliens, he would have faced at most a five-year prison sentence under United States law, *see* 8 U.S.C. § 1324(a)(1)(B)(ii), and probably much less than that under the United States Sentencing Guidelines.

7

applicable law would not necessarily amount to persecution. *Ante*, 11. But where prosecution is a mere pretext for persecution, the existence of a generally applicable law must not be allowed to cloak the government's true intent. In the present case, the Majority and the BIA have failed to adequately consider the possibility of pretext. The record compels the conclusion that Li's political opinion, *i.e.*, his humanitarian interest in assisting North Korean refugees despite China's official policy toward those refugees, along with the action he took consistent with that opinion, was at least one central ground for the Chinese government's attempt to arrest him and its continued interest in him.

While enforcement of a law of general applicability – even against an offender who objects to the law because of his political opinion – might not be on account of a protected ground, pretextual prosecution on the basis of political opinion is. *See Shardar v. Ashcroft*, 382 F. 3d 318, 323 (3d Cir. 2004); *see also Long v. Holder*, 620 F.3d 162, 166-68 (2d Cir. 2010) (distinguishing persecution from prosecution); *Li v. Holder*, 559 F.3d 1096, 1108-09 (9th Cir. 2009) (same). In the present case, the record demonstrates that China seeks to disproportionately punish Li as a result of his political opinion. China, thus, does not fairly administer the purported law at issue.

To begin with, disproportionately severe punishment may indicate that a prosecution is a mere pretext for persecution. *Shardar*, 382 F. 3d at 323.[5] On this point, Li's

---

[5]

Both the Second and Ninth Circuits have devoted considerable attention to this theory. *See*, *e.g.*, *Vumi v. Gonzalez*, 502 F.3d 150, 158 (2d Cir. 2007) (noting that the BIA

testimony that his colleagues received jail sentences of ten years demonstrates that the punishment Li feared was disproportionate to the alleged crime – assistance to North Korean refugees. Indeed, as the Chinese government began to crack down on North Korean refugees, those Chinese citizens who had assisted North Korean refugees were punished only with fines in the $3,600 range. (A.R. 215.) At a minimum, the BIA should have considered whether the ten-year sentence Li faced was so disproportionate as to constitute persecution by means of a pretextual prosecution. *See Long*, 620 F.3d at 166-68 (citing cases where disproportionate punishment or selective enforcement of a law amounted to persecution on a protected ground).

Moreover, this evidence of disproportionate punishment indicates that the purported law at issue is not fairly administered, and thus should not be considered a law of general applicability. The Majority recognizes that "[a]s a general matter . . . we have held that fear of prosecution for violations of 'fairly administered laws' does not itself qualify one as a 'refugee' or make one eligible for withholding of [removal]." *Ante*, 11 (quoting *Chang*, 119 F.3d at 1060 (citations omitted)); *see also Shardar,* 382 F.3d at 323

_____

failed to consider whether punishment was "disproportionate to the crime, which would indicate persecution on grounds of political opinion rather than prosecution or legitimate law-enforcement") (internal quotation omitted); *Chanco v. I.N.S.*, 82 F.3d 298, 302 (9th Cir. 1996) ("Although prosecution for a common law crime will not ordinarily constitute persecution, a showing of disproportionate punishment may support a claim that the prosecution is a pretext for persecution on account of political opinion.").

(quoting *Chang* for the same proposition). Here, however, China's exceptionally unfavorable application of the purported law to Li – when compared with mere fines it assessed to other alleged violators – indicates unfair administration. *See Janusiak v. I.N.S.*, 947 F.2d 46, 48-49 (3d Cir. 1991) (noting that prosecution may amount to persecution on account of a protected ground where petitioner "would be treated differently than other violators of [a] law because of [petitioner's] political leanings"). Thus, assuming a law exists that prohibits Li's conduct, China's selective and severe enforcement of the law reveals that in some circumstances China uses enforcement of the law as a pretext for persecuting political dissenters, not simply to implement rational immigration policy.

As discussed above, over the past year the Second and Ninth Circuits have addressed the persecution of Chinese citizens for humanitarian assistance provided to North Korean refugees. Both circuits found that the BIA, in denying petitions for review, failed to consider a number of factors indicating pretextual prosecution. *See Long v. Holder*, 620 F.3d 162, 164 (2d Cir. Sept. 16, 2010) (vacating and remanding for BIA's failure to consider whether prosecution of a Chinese citizen for assisting North Korean refugees may have been pretextual); *Li v. Holder*, 559 F.3d 1096, 1108-09 (9th Cir. 2009) (finding error in BIA's conclusion that petitioner is a mere criminal subject to legitimate prosecution, because police persecuted petitioner for providing aid to North Korean refugees and for expressing opinions contrary to Chinese policy). Like the petitioners in those cases, Li faces persecution under the guise of "prosecution" for his efforts to help North Korean refugees. The harsh punishment suffered by those who worked with Li to help North Korean

refugees demonstrates the likelihood that China will persecute Li on account of his political beliefs. The BIA erred in failing to consider this possibility and the considerable record evidence supporting it. *See Espinosa-Cortez v. U.S. Atty Gen.*, 607 F.3d 101, 113-14 (3d Cir. 2010) ("An applicant for asylum is entitled to a reasoned analysis, not one which wholly disregards relevant, probative evidence.")

In short, the evidence before us does not support the Majority's conclusion that Li has failed to establish persecution because there may be a generally applicable Chinese law that might criminalize his conduct and could be fairly applied to result in a proportionate punishment of ten years. The record does not contain the text of this law, the Ninth Circuit cast doubt on the existence of any law punishing Li's conduct, *see Li*, 559 F.3d at 1111 n.15, and the only available record evidence shows that China's treatment of immigration by North Koreans and of assistance to such immigrants is harsh, politicized, and far from evenhanded. There is insufficient evidence to support the BIA's finding that Li faced prosecution under a generally applicable law. I would therefore follow the course of the Second Circuit and remand for further factfinding on this issue.[6] *See Long*, 620

---

[6]

If this case were to be remanded, I also would direct the BIA to consider whether Li has established that "there is a pattern or practice of persecution of a group of persons similarly situated to him on account of a protected ground and that he is included in, or identified with, the persecuted group such that it is more likely than not that his life or freedom would be threatened if he returned." *In re A-M-,* 23 I. & N. Dec. 737, 740-41 (B.I.A. 2005) (analyzing 8 C.F.R. § 1208.16(b)(2)); *see also Wong v. U.S. Atty Gen.,* 539 F.3d 225, 232-34 (3d Cir.

F.3d at164, 168.

For the reasons stated above, I would grant Li's Petition for Review, and vacate and remand this case to the BIA for further action consistent with this dissent.

---

2008) (discussing evidence of a "pattern or practice" of persecution in the context of an asylum claim); *Lie v. Ashcroft*, 396 F.3d 530, 537-38 (3d Cir. 2005) (same).  There are reports in the record of the harsh Chinese crackdown on individuals, like Li, who assist North Korean refugees, which may evidence such a pattern or practice.  (*See* A.R. 207-09.)